*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

JAMES WASHINGTON,

        *Petitioner-Appellant,*

    *v.*

PAUL RENICO, Warden,

        *Respondent-Appellee.*

No. 05-1185

>

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 03-40287—Paul V. Gadola, District Judge.

Argued: June 8, 2006

Decided and Filed: July 27, 2006

Before: SILER, DAUGHTREY, and ROGERS, Circuit Judges.

———————

## COUNSEL

**ARGUED:** James Sterling Lawrence, Royal Oak, Michigan, for Appellant. Brad H. Beaver, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** James Sterling Lawrence, Royal Oak, Michigan, for Appellant. Brad H. Beaver, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

———————

## OPINION

———————

ROGERS, Circuit Judge. Petitioner James Washington appeals the district court's order denying his habeas petition. A Michigan jury found Washington guilty of first-degree murder and possession of a firearm during the commission of a felony. He was sentenced to life in prison. On direct appeal, the Michigan Court of Appeals affirmed his convictions. Although Washington moved for and was denied an evidentiary hearing, the state appellate court denied his ineffective-assistance-of-counsel and defense-participation claims "[b]ecause defendant failed to move for an evidentiary hearing" and because the record, as it stood, did not support his claims. The federal district court denied his habeas petition. The district court did not consider Washington's requests for an evidentiary hearing.

Washington now brings four challenges that the district court certified for appeal. He argues (1) that he was denied his constitutional right to confront a testifying witness with impeaching evidence; (2) that he was denied effective assistance of counsel because counsel did not inform him that a confession barred by *Miranda* could be used to impeach his testimony; (3) that he could not

participate in his defense when defense counsel refused Washington's request for copies of witness and police statements; and (4) that his trial was rendered fundamentally unfair when the trial court excluded certain evidence. For the following reasons, we affirm.

## I.

### A.      *Testimony and Evidence at Trial*

Three witnesses testified that they saw Washington shoot and kill James Kinville on July 27, 1999, when Kinville brought Washington a radio to repay a debt. One witness also testified that Washington told him that Washington had killed Kinville. Washington testified at trial that he did not kill Kinville. Washington's main contention on appeal is that he was unable to present evidence that one of the three eye witnesses, Robert Corcoran, was the murderer.

Two of the eye witnesses, James Gidron and Corey Barkley, both of whom were thirteen at the time of the murder, spent the night at Washington's apartment and testified to the following. They woke up in the early morning of June 27, and Washington asked the boys whether they wanted to see someone get shot. They went outside. A man later identified as Robert Corcoran was standing outside. He left and returned a few minutes later with Kinville. After Washington, Corcoran, and Kinville talked for a moment, Washington pulled a gun from his waist and pointed it at Kinville. Washington fired the gun, but the gun misfired twice. The third shot, however, caused Kinville to fall. Washington then walked up to the fallen Kinville and shot him twice in the head. Washington told Gidron that he shot Kinville because Kinville owed Washington $2500. Washington told Corcoran to take care of the body. Corcoran took the body by the legs and placed it in the bushes.

The third eye witness, Robert Corcoran, testified that he purchased cocaine from Washington twice that night. On one of the occasions when Corcoran was at Washington's residence, Washington pointed two guns at Corcoran and Dwayne Lapere's heads. He told them that their friend Todd needed to repay his debt or that Washington would shoot them. After Washington put his gun down, Corcoran and Lapere returned to Steven Smith's house, where Corcoran and Lapere were staying. Kinville, who was at Smith's house, asked for something to sell. Lapere gave him a radio. They placed the radio into a gray plastic bag. Kinville asked Corcoran to accompany him across the street, and they met Washington at his driveway.

Corcoran continued by testifying that Washington asked Kinville and Corcoran to go behind a nearby gate, and they did. After the gun misfired, Washington shot Kinville, and Kinville fell to the ground. Washington then placed the gun on Kinville's head and shot the gun once. Washington ordered Corcoran to move the body, and Corcoran did so. Washington then told Corcoran to hand over his ID, and Washington told Corcoran that he knew where Corcoran lived.

Corcoran then testified that he returned to Smith's residence and told Smith that Washington had killed Kinville. Smith then went to speak with Washington. Smith later returned to his house to collect some blankets, and he took them to Washington's residence. Corcoran testified that a car backed up near the fence at Washington's residence. After Smith and the driver of the car returned from the backyard, Corcoran saw from across the street the trunk sink "as if something was dropped inside." Corcoran ended his testimony by stating that he contacted the Saginaw Police Department that day.

The State called Officer Donald Zinz without the jury present. Zinz testified that, when he spoke with Corcoran over the telephone, Corcoran repeated his questions to a woman. The woman, in turn, gave Corcoran answers to Zinz' questions, and Corcoran repeated those answers back to Zinz. Corcoran, when recalled to the witness stand by the defense, denied having a woman answer Zinz' questions. The defense was permitted to read into evidence Zinz' prior testimony to the

contrary. The defense also called Officer Tony Eno of the Rose City Police Department and attempted to have Eno testify that Corcoran had a reputation for not being truthful.

Smith corroborated the three eye witnesses' testimony. Smith testified that Washington told him that Washington "capped" Kinville. Smith also testified that he helped dispose of the body. Smith testified that he took the police to Kinville's body in a remote area of Gladwin County.

There was also physical evidence against Washington. The police searched Washington's residence pursuant to a valid search warrant, and they discovered, among other things, a pair of shorts, a gray shopping bag, and a pair of tennis shoes. Forensic scientist Kyle Hoskins testified that she found human blood on all of these items.

Washington's testimony was substantially different from that of the other witnesses. He testified that he did not shoot Kinville and that he did not know who did. He admitted to selling drugs to Corcoran and Smith. He testified that he took Corcoran's ID as collateral for a debt. Washington testified that he arose early in the morning to clean his front yard and that his neighbor was also outside. He testified that the first that he learned of Kinville's death was when neighbor Dennis Guchen, who testified earlier at trial, pointed out the body to him that was lying in the yard as the two were making casual conversation about sports and the weather. He testified that he looked across the street and saw Corcoran looking "crazy." Washington told Guchen that Corcoran probably killed Kinville. Washington then talked with Smith, who said that he would take care of it. Washington went back to bed because he did not want anything to do with the dead body.

Despite Washington's testimony, in January 2000, a Michigan jury found Washington guilty of first-degree murder and possession of a firearm during the commission of a felony. For the murder conviction, he received life imprisonment without the opportunity for parole; for the firearm conviction, he received two years of imprisonment.

B.     *Events Concerning Specific Challenges in Washington's Habeas Petition*

There were three events at trial that assume a prominent role in Washington's habeas petition:

First, Washington argues that the trial court improperly excluded evidence that witness Corcoran (the witness who moved the body) was biased. The defense sought to demonstrate that Corcoran was biased because charges against him were dismissed in a neighboring county. The charges were for being a felon in possession of a firearm, making a false report of a felony to the police, and being in possession of a firearm while under the influence of liquor. The defense argued that it was suspicious that the charges were all dismissed by an assistant prosecutor who was a retired Saginaw City police officer. The trial court held that an inquiry concerning these charges would be legitimate. The judge said that defense counsel could explore the matter outside of the jury's presence to determine whether there was a relationship between Washington's trial and Corcoran's dismissed charges. Defense counsel asked the trial court for permission to telephone the prosecutor in the other county that had dismissed the charges against Corcoran. The trial court agreed to defense counsel's request.

The State called Corcoran to the stand outside the jury's presence. Corcoran testified that he was not told why the charges were dismissed and that he told the county prosecutor that he was testifying in a murder case in Saginaw County. Corcoran testified that the prosecutor told Corcoran that the charges were dropped because the charges were "fluffed up."

The court then took a recess. When the court returned from recess, the court stated,

It appears from telephone calls to an assistant prosecutor in Ogemaw County as well as defense counsel that at a—as of this time, with the information available to both the prosecutor and the defense, that there was no tie-in between the testimony Mr. Corcoran is going to give in this case and the dismissal of the charges.

However, since it is late—the information has been very recent, I'm going to afford defense counsel a full opportunity to explore any avenues, and therefore, I will not allow the impeachment, if any, of Mr. Corcoran today on—to explore the tie-in, if any.

But I will allow the defense counsel ample opportunity so that he can continue any discussions he may have with the prosecutor in Ogemaw County, defense counsel, and any other person. And we'll leave Mr. Corcoran under subpoena subject to recall by either the prosecutor or the defense.

Washington's counsel first stated that he was agreeable to the court's handling of the matter, and then he stated,

I think probably the record should reflect also that we took a break, I telephoned Mr. Theunick, who is the assistant prosecutor in Ogemaw County, and talked to him.

I then talked to Jon MacDonald, an attorney from Ogemaw County, regarding the case for Mr. Corcoran. And that [the prosecutor in Washington's case] spoke with Mr. MacDonald by phone and also the court spoke to Mr. MacDonald by phone. That was all done in chambers.[1]

Second, Washington challenges his trial counsel's failure to tell him that statements made without a *Miranda* warning are admissible as impeaching evidence. The trial court excluded statements Washington made in police custody because the police did not give Washington *Miranda* warnings. The State relied on the inadmissible statements, however, to impeach various parts of Washington's testimony. First, the State used the prior statements to challenge the amount of debt that Corcoran owed Washington. Second, the State also used these statements to reveal that Washington had lied to the police when he said that no one from "up North" was at his house. Third, the State also noted that Washington never mentioned to the police that he found a body face-down in his yard.

Finally, Washington challenges the trial court's decision not to admit into evidence a statement Corcoran made to unidentified others in an unrelated case that if they talked to the police about an unrelated matter, they would "wind up in the trunk and never be found." Counsel stated that he wanted to use the evidence to demonstrate that Corcoran had possibly murdered Kinville. The trial court held that the alleged statement was "hearsay on hearsay" and irrelevant because it concerned another case that never went to trial.

---

[1]Washington has moved this court to take judicial notice that the former prosecutor in Ogemaw county (Gary Theunick) has been indicted for fraud and making false statements. He also notes that the police chief of Rose City, where Corcoran lives, was also involved. *See* 5/15/06 Motion to Supplement Record. We deny the motion. This indictment is collateral to the issue of whether Theunick (and all of the other lawyers involved) lied about there being no secret deal between Corcoran and the various prosecutors.

C.      *Appellate and Habeas Review*

Washington brought six issues to the Michigan Court of Appeals on direct appeal:

(1) his inability to impeach Corcoran with evidence of his dismissed charges in another county;

(2) his counsel's failure to inform him that his prior statements to the police could be used to impeach him even though those statements, taken without *Miranda* warnings, could not be used as substantive evidence;

(3) his inability to participate in his own defense because defense counsel did not provide him with requested copies of witness statements and police reports;

(4) his ability to offer into evidence Corcoran's out-of-court statement threatening another to pay or else end up in a trunk of a car;

(5) irregularities in replacing an ill juror; and

(6) prosecutorial misconduct.

Before the state court decided his appeal, Washington filed a motion to remand so that the trial court could hold an evidentiary hearing. *See* J.A. 81-85. In that motion, he sought an evidentiary hearing to develop the facts concerning, among other claims, his ineffective-assistance-of-counsel claim and his claim that he was not able to participate in his own defense. He attached an affidavit in which he declared that he had not received from his trial counsel documents that he requested and that he would have altered the questions posed on direct examination if he had known that his testimony could have been impeached by his otherwise inadmissible statements to the police. The appellate court denied his motion for remand. *See* J.A. 79.

The Michigan Court of Appeals affirmed his conviction in May 2002. *See People v. Washington*, No. 225605, 2002 WL 1010040 (Mich. Ct. App. May 17, 2002) (per curiam). The court of appeals held the following:

(1)     that the trial court did not abuse its discretion in excluding evidence of Corcoran's dismissed charges for impeachment purposes;

(2)     that Washington failed to move for an evidentiary hearing concerning his ineffective-assistance-of-counsel claim and that the record, as it stood, did not support this claim;

(3)     that Washington also failed to move for an evidentiary hearing concerning his defense-participation claim and that the record, as it stood, did not support this claim;

(4)     that the district court did not abuse its discretion in excluding evidence of Corcoran's earlier statement concerning putting another in a trunk;

(5)     that Washington intentionally relinquished his right to challenge the replacement of the ill juror; and

(6)     that Washington failed to make a timely objection to prosecutorial misconduct and that no miscarriage of justice occurred.

*See id.* at *1-*2. The Supreme Court of Michigan denied his motion for leave to appeal in December 2002. *See People v. Washington*, 655 N.W.2d 557 (Mich. 2002) (Table).

Washington then filed his habeas petition with the federal district court in October 2004. He brought the same six claims that he brought on direct appeal. The district court held that the juror-selection and prosecutorial misconduct claims were procedurally defaulted. The district court held that the Michigan Court of Appeals had not acted contrary to, or unreasonably applied, federal law in handling the other claims. The district court also held that the exclusion of Corcoran's statements for impeachment and substantive purposes was harmless even if there was constitutional error. The district court did not discuss how the Michigan Court of Appeals first denied Washington's motion for an evidentiary hearing and then stated that Washington had not requested an evidentiary hearing. The district court (and the state appellate court) treated Washington's claim that he was not permitted to participate in his defense as an ineffective-assistance-of-counsel claim, not a claim concerning a defendant's right to self-representation.

The district court subsequently granted a certificate of appealability on Washington's claims concerning the four issues raised here. *See Washington v. Renico*, No. Civ.A. 03CV40287FL, 2005 WL 1027994, at *1 (E.D. Mich. Apr. 20, 2005). The district court refused to certify Washington's juror-selection and prosecutorial misconduct claims. *See id.* This court refused to extend the certificate of appealability in September 2005.

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), governs review of Washington's petition, filed in October 2004, because Washington filed it after the statute's effective date of April 24, 1996. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003). The district court may grant Washington's petition only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Applying AEDPA's highly deferential standard, we affirm. First, the Michigan Court of Appeals did not unreasonably apply federal law in deciding that the trial court's exclusion of impeaching evidence did not violate Washington's right to confront witnesses. Second, even though the Michigan Court of Appeals' reasoning concerning Washington's ineffective-assistance-of-counsel and defense-participation claims was based on a clearly erroneous determination that Washington had not moved for remand, Washington was properly denied an evidentiary hearing on both of these claims. He has not alleged sufficient grounds entitling him to relief. Finally, the Michigan Court of Appeals did not unreasonably apply federal law in deciding that the trial court's exclusion of substantive evidence did not violate Washington's right to due process.

A.       *Confrontation Claim*

The Michigan Court of Appeals' decision affirming the exclusion of impeachment evidence was not an unreasonable application of Supreme Court precedent for three reasons. Washington argues that the dismissal of Corcoran's charges in another jurisdiction weeks before trial could indicate, despite the statements of all of the lawyers involved, that Corcoran agreed to testify in Washington's case only if the prosecutors in the other jurisdiction would dismiss his charges. But, first, the trial court did not infringe upon Washington's constitutional right to confront witnesses against him when excluding the proffered impeachment evidence because the evidence was cumulative and only marginally relevant. Second, even if the evidence were relevant and not cumulative, the admission of the proffered evidence would not have significantly altered the jury's

impression of Corcoran's credibility because Washington was able to impeach Corcoran in several other, effective ways. And finally, even if it were unreasonable to deny counsel the opportunity to pursue the line of cross-examination at issue, the error did not affect the jury's verdict.[2]

First, the trial court's decision to exclude inquiry into Corcoran's dismissed charges in another county was a reasonable limit on cross-examination. In *Delaware v. Van Arsdall*, the Supreme Court held that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination," 475 U.S. 673, 678-79 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)), but "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, . . . prejudice, confusion of the issues, . . . or interrogation that is repetitive or only marginally relevant," *id.* at 679. The Michigan Court of Appeals held that the trial court did not abuse its discretion in excluding the evidence because Washington had not demonstrated a sufficient causal connection between the charges that were dismissed in another county by a prosecutor not involved in the case and Washington's trial. To support an inference that some form of immunity or agreement existed, which would in turn support another permissible inference that Corcoran was biased, Washington would have had to demonstrate that Corcoran, the prosecutor in Washington's case, and the attorneys in the other county were all lying about the nonexistence of any quid pro quo. Without making such a demonstration, the evidence was only "marginally relevant," *see id.* at 679, because the mere fact alone that Corcoran's charges had been dismissed would only make it slightly more, if at all, probable that he would have reason to slant his testimony. The state courts did not act unreasonably in determining that the impeaching evidence was of limited relevance.

Moreover, the evidence of bias would have been merely cumulative considering that Washington impeached Corcoran in several other ways. Washington's counsel impeached Corcoran by delving into his extensive criminal record, relying on Corcoran's prior inconsistent statements in a preliminary hearing and in a police interview, noting his use of drugs, and pointing to other felonies, for which Corcoran had not been charged, that Corcoran had committed. The defense also (rather unsuccessfully) attempted to establish that Corcoran had a reputation for not being truthful. The court also permitted the defense to read Officer Zinz' testimony that Corcoran had a woman on Corcoran's end of the telephone answer the questions that Officer Zinz posed to Corcoran. Finally, the jury learned that Corcoran was involved in the murder by moving the body. The defense, therefore, had extensively impeached Corcoran and demonstrated that Corcoran, as a witness to the murder, had reason to blame another individual. The trial court did not act unreasonably in limiting marginally relevant evidence in light of the many ways in which the defense impeached Corcoran.

The cumulative nature of the impeaching evidence supports the second reason that the state court's decision is not unreasonable: admission of the impeachment evidence would not have given the jury a "significantly different impression" of Corcoran's credibility. The Supreme Court in *Van Arsdall* stated that, even if the trial court abuses its discretion in excluding the evidence, there is a constitutional violation only if a "reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue the proposed line of cross-examination." *Id.* at 680. Because Washington impeached Corcoran's testimony in several ways, the jury would not have had a significantly different impression of Corcoran's credibility.

---

[2]Although the warden argues that Washington's trial counsel agreed that there was no relationship between Corcoran's testimony in Washington's case and the dismissal of unrelated charges in another county, this claim is not procedurally defaulted. In *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), this court held the state court must actually enforce the procedural bar for there to be an independent and adequate state ground precluding federal review. The warden points to nothing in the record to indicate that the state courts relied upon a procedural bar when rejecting Washington's claim concerning his ability to impeach Corcoran. Therefore, we review the merits of this claim.

A comparison between the facts of *Van Arsdall* and this case reveals that there was no constitutional violation in this case. In *Van Arsdall*, the witness that the defendant sought to impeach had a drunkenness charge dropped after he agreed to speak with the prosecutor about Van Arsdall's case. *Van Arsdall*, 475 U.S. at 676. The Supreme Court held that the trial court violated Van Arsdall's right to confront witnesses against him by not permitting the defense to mention the dropped charges and the witness's promise to speak to prosecutors regarding the murder allegedly committed by Van Arsdall. *Id.* at 680. Assuming, without deciding, that there are no material differences between the lines of questioning in *Van Arsdall* and this case, Washington still has not been able to demonstrate that the jurors in his case would have had a significantly different impression of Corcoran's credibility had Washington been able to discuss Corcoran's charges that were dismissed in another county. The defense in *Van Arsdall* was not able to impeach the witness in any way, and thus there was prejudice. *Id.* at 676-77. In contrast and as previously mentioned, defense counsel in this case had extensively impeached Corcoran's testimony. Washington does not explain why the excluded impeaching evidence would have had a significant impact on the jury's impression of Corcoran's credibility.[3]

Finally, even if it were unreasonable for the state trial court to determine that Washington's right to confront witnesses against him was not violated, this error did not have a substantial and injurious effect on the jury's verdict. In *Brecht v. Abrahamson*, the Supreme Court held that, if this court determines on collateral review that the defendant's confrontation right was violated, this court must ask whether the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In Washington's case, Corcoran's testimony was important but corroborated on material points by two other witnesses who stated that Washington was the shooter, and Smith testified that Washington admitted to being the shooter. Finally, the prosecution's case was strengthened by Washington's unbelievable testimony that he knew nothing of the dead body in his yard until a neighbor pointed it out and that he went to bed right after learning of it. Thus, any constitutional error here does not warrant habeas relief.

For these reasons, the Michigan Court of Appeals reasonably held that the trial court did not violate Washington's right to confront witnesses against him.

B.      *Ineffective-assistance-of-counsel claim for counsel's failure to warn Washington that his excluded confession could be used for impeachment purposes*

Although the state court and district court's opinions concerning Washington's ineffective-assistance-of-counsel claim did not fairly consider Washington's requests for an evidentiary hearing, Washington is not entitled to habeas relief on this claim. The determinative issue in this case is whether evidence may exist that would entitle Washington to release, such that the district court should have granted him an evidentiary hearing. Washington, however, has failed to demonstrate that he would be entitled to release because he has not shown that the jury would have returned a different verdict if his counsel had not erred. Because Washington cannot make his required showing, we do not remand for an evidentiary hearing.[4]

---

[3]Moreover, *Alford v. United States*, 282 U.S. 687, 693 (1931), does not require a different result. Although the Supreme Court stated in *Alford* that a defendant must be able to demonstrate that the witness' "testimony was biased because given under promise or expectation of immunity," *Van Arsdall* made it clear over fifty years later that a constitutional violation occurs only when the reviewing court determines that the impeaching evidence would significantly change a reasonable jury's impression of a witness's credibility.

[4]Washington was diligent in seeking an evidentiary hearing in state court, and the heightened "cause" and "innocence" requirements for an evidentiary hearing, therefore, do not apply. A petitioner is diligent when he requests, but is denied, an evidentiary hearing in state court, and such diligence renders the heightened requirements under

Washington cannot demonstrate that his alleged grounds, if proven, warrant his release because he cannot show that his counsel's alleged error—failing to inform him that statements made without a required *Miranda* warning could be used for impeachment despite their inadmissibility as substantive evidence—prejudiced him. Whether Washington has alleged grounds sufficient for his release depends upon whether Washington can demonstrate that he received ineffective assistance of counsel under the well-known test provided in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, "a defendant's right to effective assistance of counsel is violated where counsel's representation fell below an objective standard of reasonableness, and where there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *McFarland*, 356 F.3d at 709-10 (internal quotation marks and citations to *Strickland*, 466 U.S. at 688, 694, omitted). Our de novo review of these claims convinces us that, even if Washington is able after an evidentiary hearing to demonstrate that his counsel's representation fell below a reasonable level,[5] Washington has not demonstrated that there is a reasonable probability that the jury would have returned a different verdict in the absence of defense counsel's error.

Washington can demonstrate no prejudice because only one of the three statements used to impeach him was material, and those statements (material or otherwise) could not have affected the jury's verdict in the face of Washington's implausible testimony. First, only one of the statements used to impeach Washington referred to Kinville's death—namely, when the State pointed out that Washington never mentioned to the police finding a body in his yard. The other statements dealt with collateral matters: the amount of a debt and whether people from "the North" were at his house. The jury almost certainly would not have attached much significance to these two discrepancies.

Second, Washington's story was so implausible that the impeachment concerning the prior statements could not have made a significant difference to the jury. Washington testified that he did not learn of the dead body until he was cleaning his yard at five o'clock in the morning. He said he

---

§ 2254(e)(2) inapplicable. *See McFarland v. Yukins*, 356 F.3d 688, 712 (6th Cir. 2004). Washington's motion for the state court of appeals to remand his case to the trial court for an evidentiary hearing was a sufficient request. *See People v. Bero*, 425 N.W.2d 138, 142 (Mich. Ct. App. 1988) (per curiam). The Michigan Court of Appeals, nevertheless, denied the request. The state court then, mistakenly, limited its review of Washington's claim to the record as presented on appeal "[b]ecause [Washington] failed to move for an evidentiary hearing or a new trial." *Washington*, 2002 WL 1010040, at *1. The state court's reliance on Washington's failure to move for an evidentiary hearing is clearly erroneous. Because Washington was diligent in requesting an evidentiary hearing, this court need not consider the heightened standards of § 2254(e)(2).

But even when a petitioner is diligent in requesting an evidentiary hearing, the district court abuses its discretion in denying an evidentiary hearing only if the petitioner can demonstrate that (1) the grounds he alleges are sufficient to secure his release from custody, (2) relevant facts are in dispute, and (3) the state court did not provide a full and fair evidentiary hearing. *See Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003). The only factor disputed in this case is whether Washington alleges sufficient grounds to secure his release.

[5] We assume, without deciding, that it would be unreasonable for defense counsel to ignore the potential impeaching use of statements, taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), that are not admissible as substantive evidence. The Supreme Court squarely held more than thirty years ago that statements rendered inadmissible because of the government's failure to provide *Miranda* warnings may be used for impeachment. *Harris v. New York*, 401 U.S. 222 (1971). Simply ignoring the impeaching use of the statements is probably not reasonable because of the damage that may come from the otherwise inadmissible statements. Counsel instead has many ways of addressing this potential (and common) problem. For example, defense counsel can (1) advise his client of the statements' potential use, (2) frame questions in a way that seeks to prevent the matters subject to impeachment from arising, or (3) deflate the power of the State's impeachment by confronting on direct the potentially inconsistent statements. We assume that if a defendant shows that defense counsel did not know or consider that these statements could be used for impeachment, a defendant could demonstrate that counsel's representation fell below a reasonable level of representation. *See Johnson v. Lockhart*, 921 F.2d 796 (8th Cir. 1990); *People v. Sclafani*, 347 N.W.2d 30, 32 (Mich. Ct. App. 1984).

talked with Smith, who said he would take care of it, and he went back to bed. He did not call the police. Although he stated that he did not go up right by the body (which he also said was not bleeding, despite at least two gun shots), Washington's shorts and shoes had blood on them. Washington never attempted to explain why he had blood on his shoes or shorts. In other words, even if the evidence did not squarely indicate that Washington was the shooter, it demonstrated that he was almost certainly at the scene when the murder occurred and knew what happened, which contradicted his version of events. Because it is highly unlikely that the three impeaching incidents challenged in this habeas petition had a substantial impact on the jury's verdict considering all of the evidence presented at trial, Washington cannot demonstrate that he received ineffective assistance of counsel.

Washington was therefore properly denied an evidentiary hearing on this matter.

C.     *Washington's participation in his defense*

Washington is also not entitled to an evidentiary hearing on his claim that he was not permitted to assist in his defense because he has not alleged sufficient grounds for release. As with Washington's ineffective-assistance-of-counsel claim, he moved for, and was denied, an evidentiary hearing to determine whether his counsel refused to provide him upon his request with police reports and witness statements. The question again is whether the district court, which did not address the state court's denial of his request, abused its discretion in denying him an evidentiary hearing. As with Washington's claim concerning the impeaching statements, the issue here is whether Washington has alleged sufficient grounds entitling him to relief. Washington is not entitled to an evidentiary hearing because he is unable to demonstrate prejudice from his counsel's alleged error to provide him documents.

Even assuming that the evidence reveals that Washington's trial counsel acted unreasonably in refusing to show him requested documents, Washington has failed to demonstrate any prejudice. To receive an evidentiary hearing, "bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring . . . an evidentiary hearing." *E.g.*, *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). Washington argues that he cannot demonstrate prejudice because he has not received an evidentiary hearing to determine what prejudice exists. This court has already held that Washington's reasoning is "circular" and "would entitle every habeas defendant to an evidentiary hearing on any issue." *Bowling*, 344 F.3d at 512. Although Washington averred in his affidavit that he still had not reviewed the documents he requested, he offers no reason why his current counsel could not show him those documents and permit him to identify which inquiries, if any, he would have pursued or which statements, if any, he could have used to his benefit. Because Washington has not demonstrated any prejudice from his counsel's alleged refusal to permit Washington to review documents, he was properly denied an evidentiary hearing on his defense-participation claim.

To avoid our consideration of prejudice, Washington frames his claim as one concerning his ability to provide self-representation. This contention is without merit. Washington argues that the Supreme Court recognized his right to participate in his defense in *Faretta v. California*, 422 U.S. 806 (1975), the case in which the Supreme Court recognized that defendants have a constitutional right to represent themselves. He relies on language in *Faretta* that mentions the "assistance" of counsel in the context of determining that the right to put on a defense is the right of the defendant. *See* Washington's Br. at 41-42. It appears that his argument is that the greater right to represent one's self necessarily includes the lesser right to participate in one's own defense by demanding that his counsel comply with his requests. The better Supreme Court case for Washington's claim, however, is *Strickland* because the Supreme Court expressly discussed, albeit in dicta, counsel's duty to assist clients:

> Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant. . . . From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.

466 U.S. at 688. *Strickland*'s language is more on point, and, thus, Washington's claim sounds in ineffective assistance of counsel, not self-representation.

Treating Washington's claim as one concerning ineffective assistance of counsel also makes practical sense because *Strickland* requires Washington to demonstrate prejudice. Washington relies on the right of self-representation, rather than ineffective assistance of counsel, because denial of the *Faretta* right is a structural error for which Washington need not show any prejudice. *See McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984). Ineffective assistance of counsel, in contrast, requires that the defendant demonstrate that his counsel's error was prejudicial. *See Strickland*, 466 U.S. at 691. Requiring defendants to demonstrate prejudice makes sense for participation claims because, unlike self-representation claims, the participation errors come in various degrees and will usually not be on the record. "The right [to self-representation] is either respected or denied," *McKaskle*, 465 U.S. at 177 n.8, and a waiver of counsel can occur only if made knowingly and voluntarily on the record, *see Faretta*, 422 U.S. at 835. In contrast, the right to participate may be marginally infringed or irrelevant to the merits of the case, and the error will almost never appear in the record.[6] These considerations support treating a defense-participation claim as an ineffective-assistance-of-counsel claim and thus determining whether defense counsel's error prejudiced the defendant.

Because Washington has not demonstrated prejudice as to his defense-participation claim, Washington was properly denied an evidentiary hearing on this claim.

D.     *Exclusion-of-Evidence Claim*

The Michigan Court of Appeals did not unreasonably apply federal law in determining that the exclusion of evidence (that Corcoran stated that two people would end up in a trunk if they told the police about a different criminal matter) did not violate Washington's right to present his defense. Washington relies primarily upon *Chambers v. Mississippi*, 410 U.S. 284 (1973), in which the Supreme Court held that the defendant's combined inability to impeach his own witness and to present trustworthy out-of-court statements that his witness had admitted to the murder at issue violated the Due Process Clause by rendering the defendant's trial fundamentally unfair. The state courts' determination that the exclusion of Corcoran's out-of-court statement did not render Washington's trial fundamentally unfair was not an unreasonable application of or contrary to *Chambers* because the evidence in Washington's case (1) did not qualify for the catch-all hearsay exception, (2) was, at most, marginally relevant, and (3) could have been admitted as impeachment evidence.

First, the statement at issue was not so reliable as to be admitted under the catch-all hearsay exception. The Supreme Court in *Chambers* held that the hearsay testimony of a declarant's admission to the murder at issue should have been allowed because the out-of-court statement had sufficient indicia of reliability. *Chambers*, 410 U.S. at 300. Washington argues that Corcoran's statement concerning putting others in the trunk also had indicia of reliability and thus was

---

[6]For instance, defense counsel could refuse to give his client the statements of a victim's character witness who dies before trial and whose testimony is never used at trial. Not only would the error not be on the record, but it would have absolutely no effect on the proceedings and certainly not "infect the entire trial process." *Brecht*, 507 U.S. at 630.

admissible under the catch-all hearsay exception in Michigan Rule of Evidence 803(24).[7] This statement, however, unlike the one in *Chambers*, does not demonstrate indicia of reliability. Although Corcoran was available for cross-examination, which is relevant in determining the reliability of a hearsay statement, Washington has not described, at any stage of the proceedings, when the statements were made or specifically to whom. *See Chambers*, 410 U.S. at 300-01. Moreover, this statement, unlike the three confessions in *Chambers*, was not as clearly self-incriminating because Corcoran did not state that he had murdered Kinville. *See id.* at 301. This statement does not have indicia of reliability equivalent those of the statements in *Chambers*.

Second, Washington's proffered evidence was not nearly as relevant to his defense as the confessions in *Chambers*. In *Chambers*, the evidence at issue was highly relevant and strongly exculpatory because another person had allegedly admitted to committing the crime for which Chambers was found guilty. *Chambers*, 410 U.S. 300-01. Washington argues that it is more likely that Corcoran was the shooter because, in an unrelated case, he threatened to put others in a trunk if they talked to the police. But the statement does not demonstrate, at least to any significant degree, that Corcoran was as or more likely than Washington to have been the shooter in this case. Instead, the out-of-court statement, if assumed true, makes it more likely only that Corcoran, as he testified, was at the scene of and participated in Kinville's murder. The out-of-court statement in this case is neither as probative nor as exculpatory (from Washington's standpoint) as the confessions in *Chambers*.[8]

Finally, unlike the defendant in *Chambers*, Washington has not argued on appeal that he was unable to use this information for purposes of impeachment. The Supreme Court in *Chambers* grounded its holding in the fact that, under Mississippi law, the defendant could neither proffer reliable hearsay evidence nor call the alleged murderer (the declarant) as a witness and then impeach him. If one assumes that the statement was relevant, Washington, unlike Chambers, presumably could have asked Corcoran whether he ever threatened to put another in a trunk. If Corcoran denied doing so, Washington's counsel could have impeached Corcoran's testimony with Corcoran's out-of-court statement.[9] The jury in Washington's case, unlike the jury in *Chambers*, most likely could have considered the out-of-court statements in some manner had counsel used the statements to impeach.

The Michigan Court of Appeals, therefore, did not act unreasonably by determining that the trial court's exclusion of evidence did not render Washington's trial fundamentally unfair.

---

[7]Washington does not argue that the statements should have been admitted under other hearsay exceptions.

[8]Whether the exclusion of the evidence is contrary to traditional evidence law is a different question than whether the exclusion of the evidence rendered the trial fundamentally unfair. Although Washington cites *McCormick on Evidence* for the proposition that his evidence is admissible as merely one metaphorical link of a chain, the exclusion of this evidence, even if relevant, does not necessarily render the trial fundamentally unfair. Washington points to no other links of a chain that support an inference that Corcoran was the shooter, and the evidence, by itself, is not compelling. Therefore, even if this court were to disagree with the Michigan courts' determination that this piece of evidence was completely irrelevant, *Washington*, 2002 WL 1010040, at *1, this court is not compelled to hold that the trial was fundamentally unfair simply because the trial court excluded a weak piece of evidence for which the record offered no other support.

[9]It appears that defense counsel did not move to impeach Corcoran on January 7, 2000, during his cross-examination with Corcoran's statement concerning placing others in a trunk. *See* J.A. 235-48. Defense counsel, instead, appears only to have sought the admission of the statement as substantive evidence on January 11, 2000, when the defense was presenting its case. *See* J.A. 343-44.

**III.**

For the foregoing reasons, we affirm.  We also deny Washington's motion asking us to take judicial notice of new facts, collateral to the facts of the underlying case.