**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name:  06a0693n.06
Filed:  September 21, 2006

No. 04-4020

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

GREGORY HARRIS,
　　　*Petitioner-Appellant,*


　　　　v.

KHELLEH KONTEH,
　　　*Respondent-Appellee.*

On Appeal from the
United States District Court for
the Northern District of Ohio

_____

Before:  KENNEDY and COLE, Circuit Judges; VARLAN, District Judge[*]

**KENNEDY, J.**  Appellant Gregory Harris seeks review of the district court's denial of his petition for a writ of habeas corpus, which he submitted to challenge his state conviction pursuant to 28 U.S.C. § 2254 on the grounds that his trial counsel was constitutionally ineffective.  Mr. Harris continues to assert that his counsel's failure to challenge an allegedly biased juror for cause or to employ a peremptory challenge to remove the juror constitutes ineffective assistance of counsel.  The district court denied this habeas petition, and we **AFFIRM** this result, although we do not agree with all of the analysis of the district court.

On June 20, 2001, Mr. Harris was indicted by a grand jury on four counts: (1) felonious assault, in violation of Ohio Revised Code § 2903.11(A)(2), with a firearm specification under § 2941.145; (2) carrying a concealed weapon, in violation of § 2923.12; (3) possessing a weapon while

---

[*] The Honorable Thomas A. Varlan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

under disability, in violation of § 2923.13(A)(2); and (4) tampering with evidence, in violation of § 2921.12(A)(1). Mr. Harris was tried before a jury. The jury convicted Mr. Harris on all four counts. He was sentenced to a term of ten years in prison.

After his conviction, and with new counsel, Mr. Harris appealed his sentence, alleging five assignments of error. The only assignment of error relevant to the present proceeding is Mr. Harris's first: "Appellant was denied effective assistance of counsel when his attorney failed to challenge prospective juror Barber for cause or to exercise a peremptory challenge on her." On August 2, 2002, the state appellate court affirmed on all issues except for the third assignment of error concerning the sufficiency of evidence on the concealed weapon charge, which the court of appeals found well taken. That count was dismissed. Accordingly, Mr. Harris was resentenced on September 10, 2002, to ten years' imprisonment.

On August 12, 2002, Mr. Harris, pro se, filed in the state court of appeals a motion for reconsideration. That court denied the motion on August 29, 2002. Prior to entry of the court order denying the motion, Mr. Harris filed a pro se appeal with the Supreme Court of Ohio. Mr. Harris asserted, in part, that he "was denied the effective assistance of counsel when his attorney failed to challenge pr[o]sective juror Barber for cause or to exercise a peremptory challenge on her."

On January 24, 2002, Mr. Harris, pro se, filed in the Court of Common Pleas, Lucas County, Ohio, a petition to vacate or set aside the judgment. Mr. Harris raised two claims, both alleging ineffective assistance of counsel. Although his petition made a request for an evidentiary hearing, his responses to the state's motion to dismiss and motion for summary judgment make no mention of the need for an evidentiary hearing pertaining to ineffective assistance of counsel with respect to the voir dire. On April 26, 2002, the Court of Common Pleas dismissed Mr. Harris's petition on

2

summary judgment. Mr. Harris filed a pro se "motion for leave to file delayed motion for new trial" in the state court of appeals, which was denied on November 15, 2002. Neither of these proceedings was appealed to the Supreme Court of Ohio.

Mr. Harris then filed this action for a writ of habeas corpus based on two grounds. He appeals, however, only the denial of his claim of ineffective assistance of counsel. Mr. Harris based his claim of ineffectiveness on the fact that his attorney, Thomas J. Szyperski, did not challenge for cause or exercise a peremptory challenge to strike Ms. Barber from the jury. When the Ohio Court of Appeals examined this issue, it attributed Mr. Szyperski's decision to retain Ms. Barber to trial strategy. The court referenced case law indicating that "counsel's decisions as to which jurors to excuse and which ones to keep are considered to be a part of trial strategy" and "strategic choices of counsel are presumed to be sound." The Ohio Court of Appeals applied that law to the facts of the case and found it "important to note that several times during voir dire defense counsel took the time to consult with appellant, which indicates that counsel was carefully considering the potential jurors." The court also expressed the view that "Mrs. [B.] was simply being truthful with defense counsel," noting that "jurors naturally will attach more credibility to the testimony of some witnesses than to others." Additionally, the Ohio Court of Appeals ultimately decided that it was "unable to find that there is a reasonable probability that the verdict as to the charge would have been different if counsel had excused Mrs. [B]."

The district court held that the state court did not unreasonably apply the law when the state court found that: (1) the multiple times Mr. Harris's counsel conferred with Mr. Harris during the voir dire indicated strategic decision-making by counsel, and (2) Mr. Harris was not prejudiced by the performance of his trial counsel because the testimony of the police officers did not go to the

3

issue of guilt, explaining that "none of the officers who testified witnessed the shooting" and the "key witnesses as to that charge were the victim, his wife and his neighbor." Thus, the district court ruled that counsel was not ineffective and denied Mr. Harris's habeas corpus petition. The district court found that the issues could "be resolved from the record" and "an evidentiary hearing [was] not required." This appeal followed.

## BACKGROUND

In the course of the voir dire, Mr. Harris's attorney had engaged in a pattern of questioning prospective jury members, conferring with his client, and ultimately using three of Mr. Harris's four peremptory challenges to strike three members of the jury venire. Neither Mr. Szyperski nor the prosecutor, Gary G. Cook, moved to strike a juror for cause. At one point, the court advised the jury that it was appropriate for the lawyers to "come to the Bench [and] turn and look at [the jury]," emphasizing that it was "important [for] Mr. Szyperski to consult with his client during the process here of exercising the challenges." The court and the prosecutor also questioned potential jury members. Bonnie L. Barber was one of the individuals ultimately empaneled to sit on the jury for Mr. Harris's trial. The voir dire questions directed at Ms. Barber and her responses, as excerpted from the trial transcript, included the following:

> THE COURT: . . . I'm going to ask you your occupational status[, and i]f you have children who are outside the home and employed, what . . . their occupational status is. . . . Ms. Barber?
>
> MS. BARBER: . . . I have a son that's a Toledo detective . . . .
>
> . . .
>
> MR. COOK: . . . How do you feel about having to make a decision that's going to affect people's lives? . . . I'm using the plural because obviously there is a defendant in this case, Mr. Harris, and obviously there are people that are going to have to come

4

to the witness stand to have to testify about what happened here. And . . . the allegations are that Mr. Harris shot a gun at another person. So obviously there's another person involved and there's an effect on that person's life. . . . [A]nyone else have a problem with that?

MS. BARBER: I do. . . . I don't like the idea of I have to make a decision to put someone away or I just don't like that idea.

. . .

MR. COOK: How did you feel knowing that you don't decide whether or not there's a punishment, but knowing that you have to make a decision? . . .

MS. BARBER: I'm not comfortable making a decision like that.

MR. COOK: Okay. Is it a comfort that you will be able to get past . . . ?

MS. BARBER: I'm sure I could get past it.

MR. COOK: But it's not a comfortable feeling?

MS. BARBER: It's not comfortable. I'll be honest.

. . .

MR. COOK: . . . I'm going to read off a couple of names of some potential witnesses here. . . . Is anybody aware of these people?

MS. BARBER: I know of them.

MR. COOK: And do you know them personally, so your knowledge of these people would make a difference as to whether or not you could make a decision?

MS. BARBER: No, No.

. . .

MR. SZYPERSKI: . . . Ms. Barber?

MS. BARBER: Yes.

MR. SZYPERSKI: . . . You mentioned that you have a son who is a detective?

5

MS. BARBER: Uh-huh.

MR. SZYPERSKI: What type of work on the police department and it's Toledo Police?

MS. BARBER: Right.

MR. SZYPERSKI: You mention that you know of Detective Navarre?

MS. Barber: Uh-huh.

MR. SZYPERSKI: And you may know of some of the other uniform officers that Mr. Cook mentioned?

MS. BARBER: Yeah. I know of them.

MR. SZYPERSKI: You ever meet any of those --

MS. BARBER: I have met the chief of police when he was a young boy because he's from our neighborhood.

MR. SZYPERSKI: He turned out all right, huh?

MS. BARBER: Yeah, he did.

MR. SZYPERSKI: Where was -- where did he grow up?

MS. BARBER: Point Place.

MR. SZYPERSKI: Point Place. Best place any place, right?

MS. BARBER: Right.

MR. SZYPERSKI: That's what they say. In any event, what type of work does your son do?

MS. BARBER: He's only been a detective since June and he has like personal attacks. Like rape.

MR. SZYPERSKI: Crimes against persons?

MS. BARBER: Right.

MR. SZYPERSKI: Does he live close to you or --

MS. BARBER: Yes. He lived out in the Point. He doesn't live with me, no, but he lives in our neighborhood.

MR. SZYPERSKI: Is he married?

MS. BARBER: Yes.

MR. SZYPERSKI: And he's been a police officer for --

MS. BARBER: Fourteen years.

MR. SZYPERSKI: What did he do before becoming a detective? A variety of things?

MS. BARBER: Just a regular police officer.

MR. SZYPERSKI: Driving patrol car?

MS. BARBER: Uh-huh.

MR. SZYPERSKI: Did he do traffic work sometimes?

MS. BARBER: He worked the East Side. I do know that.

MR. SZYPERSKI: Do you ever talk to him about his work?

MS. BARBER: He doesn't volunteer. If I asked him, he'll tell me. You know, if I see something in the paper and I ask him about it, he might, you know, tell me, but he does not volunteer his work.

MR. SZYPERSKI: Okay. Do you feel that in this case we're going to hear testimony from police officers --

MS. BARBER: Uh-huh.

MR. SZYPERSKI: -- do you feel that you're going to place a little more weight with the testimony of the officers than a layperson?

MS. BARBER: To be honest with you, yes.

MR. SZYPERSKI: You do?

MS. BARBER: Yes.

MR. SZYPERSKI: And would it be safe to say that even if I told you that you shouldn't do that, more important, the judge said, would it be safe to say, being honest as you have all morning -- and I know this has been a little difficult for you.

MS. BARBER: I guess. I guess because my son is a policeman. Maybe that's why.

MR. SZYPERSKI: Exactly. That's why I'm asking you these questions.

MS. BARBER: Right.

MR. SZYPERSKI: But would it be safe to say that if you were deliberating and there was a question of just the fact alone he's a cop, therefore I'm going to give him a little -- I'm going to give him the benefit of the doubt. Would that be your position?

MS. BARBER: I don't know.

MR. SZYPERSKI: All right. Well, you're backing off a little now.

MS. BARBER: See, I guess -- I guess I --

MR. SZYPERSKI: I'm not trying to argue with you.

MS. BARBER: I guess I lean towards the police.

MR. SZYPERSKI: You lean toward the police.

MS. BARBER: Right.

At the conclusion of the voir dire, the judge gave the attorneys the opportunity to make challenges for cause and peremptory challenges at the bench. Both Mr. Szyperski and Mr. Cook expressed that they did not wish to challenge anyone for cause. After the court confirmed the state's intent to pass for cause, Mr. Szyperski paused to confer with his client. Upon returning to the bench, Mr. Szyperski confirmed that his defendant passed on challenges for cause. Next, Mr. Cook passed on his turn to use a peremptory challenge. Mr. Szyperski, for his first turn, struck juror number eleven. The state subsequently continued to pass on each of its turns. Before Mr. Szyperski used

8

his second peremptory challenge, he again excused himself from the bench, stating that he was "going to have to go back to [his] client." It was at this time that the court interjected to explain to the jury that it was proper for the attorneys to be looking at them, engaging in whispered discussions at the bench, consulting with clients and each other, and exercising peremptory challenges. Upon his return to the bench, Mr. Szyperski stated that "[a]fter long deliberation, [he wished to strike juror] number one." Before using his third peremptory challenge, Mr. Szyperski again departed from the bench, saying he would "be right back," and struck another juror immediately upon his return. On his final turn, Mr. Szyperski once more excused himself from the bench and, after returning, passed on the last challenge. Ms. Barber remained on the jury.

At trial, the jury heard testimony from a number of law enforcement officials.[1] The first police officer to take the stand testified that no useable fingerprints were found on the gun recovered by the arresting officers, and he stated that the police did not conduct a gunpowder residue test on Mr. Harris's hands after his arrest. The jury also heard testimony from the responding detective, who stated that, though he surveyed the area where the gun was found, he was not able to locate any shell casings in the vicinity, nor did his search of the victim's house and surrounding area discover any bullet holes. Another police officer testified that he saw the suspect place his hand near his hip area "almost as if he was trying to hold something or grab something," he heard a shot fired after Mr. Harris was out of sight, and, when the officer apprehended Mr. Harris, he did not find a gun in the suspect's possession. An additional officer testified to finding a gun in the area and also to unsuccessfully searching for a shell casing.

---

[1]The following account of the law enforcement officials' testimony has been construed from the Court of Appeals of Ohio's decision, which is not contested with respect to these issues.

Mr. Harris appeals the district court's denial of the ineffective assistance ground of his habeas petition, asserting that Ms. Barber was biased, as evidenced by the fact that her son is a detective with the Toledo Police Department and her voir dire statements indicated that she would give more weight to the testimony of police officers than to non-law enforcement witnesses.

**ANALYSIS**

I.     Mr. Harris's habeas petition will be denied because the district court's determination that the Ohio Court of Appeals's decision that his counsel was not ineffective was reasonable.  That court had sufficient evidence to conclude that Mr. Szyperski's retention of Ms. Barber on the jury was a strategic decision and was not unreasonable under Supreme Court decisions.  However, we conclude that it was unreasonable for the district court to accept the Ohio Court of Appeals's determination that police testimony was insignificant to Mr. Harris's conviction.  When the Ohio Court of Appeals determined that Mr. Harris was not prejudiced by his attorney's decision to retain Ms. Barber, it made the finding that police testimony was not significant to the case for the purpose of showing that the attorney's decision to keep a juror predisposed to believe the police, which was the error alleged, would not have had any effect on the trial's result.  However, as we conclude that retaining Ms. Barber on the jury does not constitute an error for the purpose of finding an attorney ineffective, the district court's error in accepting the Ohio Court of Appeals's conclusion as to the prejudice prong does not demand further consideration.

Pursuant to 28 U.S.C. § 2254(d), a federal court:

May not grant a writ of habeas to a petitioner in state custody with respect to any claim adjudicated on the merits in state court unless the adjudication--

10

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

An ineffective assistance of counsel claim poses a mixed question of fact and law. *Olden v. United States*, 224 F.3d 561, 565 (6th Cir. 2000). The district court applies the second clause of 28 U.S.C. § 2254(d)(1) when reviewing a mixed question, and thus reviews the state court's decision under the "unreasonable application" standard. *Biros v. Bagley*, 422 F.3d 379, 386 (6th Cir. 2005). In order for the court to find an "unreasonable application," it must determine that the state court's decision was "objectively unreasonable," that is, "more than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). *Strickland v. Washington* supplies the clearly established law applicable to this case. 466 U.S. 668 (1984). In *Strickland*, the Supreme Court ruled that, in order for a counsel's performance to be deemed ineffective, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness" and "that counsel's performance prejudiced the petitioner." *Id.* at 687-88.

We cannot find that the district court abused its discretion in accepting as reasonable the state appellate court's finding that the decision of Mr. Harris's attorney not to strike Ms. Barber was one of strategy. Examination of the voir dire that occurred prior to trial demonstrates that Mr. Harris's attorney engaged in a pattern of consulting his client when exercising his strikes. As the Ohio Court of Appeals concluded, such repeated consultations reasonably indicate that the attorney was carefully considering each potential juror, and thus his decision to retain Ms. Barber was strategic. While it is unclear whether Mr. Harris's attorney consulted with his client specifically about Ms. Barber

11

and/or obtained his client's permission to retain her on the jury, it is apparent from the voir dire transcript that he returned from the bench to speak with Mr. Harris before asserting each of his three challenges. Circumstances even prompted the trial court to explain to the jury that it was appropriate for the attorney to examine the jurors, consult with his client, and exercise peremptory challenges at that stage in the process.

Despite Mr. Harris's assertion that his counsel's course of conduct "had no reasonable basis in effectuating [his] interest," examination of the record as a whole suggests that the decision to keep Ms. Barber on the jury would be a reasonable defense strategy. There is no indication that Ms. Barber had any personal bias against Mr. Harris. During voir dire, Ms. Barber expressed the defendant-friendly sentiment that she would be uncomfortable making the decision to imprison someone. Her responses reflect an honesty and self-awareness of her inclinations that might be appealing to a defense attorney. Additionally, any bias that Ms. Barber did harbor was not in support of the prosecution and against the defense but rather showed favoritism to police witnesses. In this case, police testimony was both favorable and unfavorable to Mr. Harris. While police provided damaging testimony about the discovery of the gun in the area where Mr. Harris allegedly ran, law enforcement officers also provided accounts that would benefit Mr. Harris if believed. Officers testified that they did not find shell casings or bullet holes on the scene, that there were no usable fingerprints recovered from the gun, that a gunpowder residue test was not conducted on Mr. Harris's hands, and that Mr. Harris, when tackled, did not have a gun in his possession.

In addition to our examination of the record for this case, we must also remain mindful that our law dictates that courts presume that the strategic choices of trial counsel are sound. *Strickland*, 466 U.S. at 689. This court has even stated that "counsel is accorded particular deference when

conducting voir dire," emphasizing that "[a]n attorney's actions during voir dire are considered to be matters of trial strategy." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001).

However, inspection of the record indicates that the Court of Appeals of Ohio did err in concluding that the police officers' testimony was inconsequential in the disposition of the case. Law enforcement officials testified to viewing Mr. Harris with his hand near his hip area "trying to hold something or grab something" and to recovering the gun from the area where Mr. Harris was allegedly seen running. As Mr. Harris was not in possession of the gun when apprehended, nor was he linked to the gun via fingerprints or residue, the testimony of these officers provided information that was critical to the prosecution's portrayal of the crime. Nevertheless, as we find that counsel's decision to retain Ms. Barber was a strategic decision, the district court's error as to the significance of the officers' testimony, which relates to the prejudice prong of the *Strickland* test, does not demand further proceedings in order to deny the ineffective assistance of counsel claim.

II.     Additionally, we find that the district court did not abuse its discretion by denying Mr. Harris's request for an evidentiary hearing, as the trial record is sufficient to conclude that counsel's decision not to strike Ms. Barber was made because of strategy, not incompetence. The district court reasonably concluded that there was ample evidence indicating that Mr. Harris's attorney acted strategically. No factual issue requiring an evidentiary hearing remains in dispute. While concerns for fairness might seem to advise in favor of granting an evidentiary hearing, we cannot ignore the language of § 2254(e)(2) and "Congress' intent to avoid unneeded evidentiary hearings in federal habeas corpus." *Williams v. Taylor*, 529 U.S. 420, 436 (2000). Here, the district court determined that an evidentiary hearing was not required, and, as explained above, the record was sufficient to support such a determination.

13

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the district court's judgment denying the writ of habeas corpus.

**R. GUY COLE, JR., Circuit Judge, dissenting.**

Because I would remand this case for an evidentiary hearing to determine why Harris's counsel failed to remove Mrs. Barber from the jury, I respectfully dissent.

**I.**

A district court should grant an evidentiary hearing if the petitioner can demonstrate that: "(1) the grounds he alleges are sufficient to secure his release from custody, (2) relevant facts are in dispute, and (3) the state court did not provide a full and fair evidentiary hearing." *Washington v. Renico*, --- F.3d ---, 2006 U.S. App. LEXIS 18747 at *24 n.4 (6th Cir. 2006) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Under AEDPA, a district court should not hold an evidentiary hearing unless the habeas petitioner "failed to develop the factual basis of a claim in State court proceedings" and he shows "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A)(ii). If a petitioner survives this hurdle, Rule 8 of the Rules Governing § 2254 Proceedings as adopted by the Supreme Court sets forth the procedure a district court must employ when determining whether to conduct an evidentiary hearing. *See* Rule 8 Advisory Committee's Note (Rule 8 does not "supercede the restrictions on evidentiary hearings contained in 28 U.S.C. § 2254(e)(2)."). Under Rule 8, "the judge must review the answer, any transcripts and records of state-court proceedings, and any [other] materials . . . to determine whether an evidentiary hearing is warranted."

We review a district court's decision not to conduct an evidentiary hearing for an abuse of discretion. *Alley v. Bell*, 307 F.3d 380, 389 (6th Cir. 2002). A district court has abused its discretion

15

when we are left with a definite and firm conviction that the trial court committed a clear error of judgment. *Eagles, Ltd. v. American Eagle Found*, 356 F.3d 724, 726 (6th Cir. 2004) (quotation omitted). Further, "[a] district court abuses its discretion when it relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 577 (6th Cir. 2006) (quotation omitted).

## A.

As a threshold matter we must first determine whether Harris "seeks to apply a rule of law that was clearly established at the time of his conviction in the state court." *Miller*, 385 F.3d at 672 (citation omitted). I would find that he does. Harris, in claiming that his trial counsel was constitutionally ineffective in not seeking to remove Barber from the jury either "for cause" or with a peremptory challenge, relies on the Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland*, which was clearly established law at the time of Harris's trial, "established a two-prong test to evaluate claims of ineffective assistance of counsel pursuant to the Sixth Amendment." *Miller*, 385 F.3d at 672. "First, the petitioner 'must show that counsel's representation fell below an objective standard of reasonableness.'" *Id*. (quoting *Strickland*, 466 U.S. at 689). "'Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Id*. (quoting *Strickland*, 466 U.S. at 689). "Second, the petitioner must show that counsel's performance prejudiced the petitioner." *Id*. (citing *Strickland*, 466 U.S. at 689). In other words, "the petitioner must 'show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 689).

Supreme Court precedent clearly establishes that the denial of the right to be tried by an impartial decisionmaker is an error that taints any resulting conviction with constitutional infirmity. *See*, *e.g.*, *Neder v. United States*, 527 U.S. 1, 8 (1999) (holding that the presence of a biased decisionmaker is structural error "subject to automatic reversal"); *Edwards v. Balisok*, 520 U.S. 461, 469 (1997) ("A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him."); *Johnson v. United States*, 520 U.S. 461, 469 (1997); *Rose v. Clark*, 478 U.S. 570, 577–78 (1986); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). The right to an impartial jury "is the lens through which [this Court] must examine counsel's performance in this case." *Id.* (citing *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988) (in a direct appeal, "[h]ad [the biased juror] sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove [the juror] for cause, the sentence would have to be overturned")).

It is likewise clear that the primary purpose of *voir dire* is to "select an impartial jury." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). *See also McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 554 (1984) ("One touchstone of a fair trial is an impartial trier of fact - - 'a jury capable and willing to decide the case solely on the evidence before it.' . . . *Voir dire* examination serves to protect that right by exposing possible biases." (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982))). Further, in determining whether a juror is biased, the question "is plainly one of historical fact." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). If "a juror [swore] that he could set aside any opinion he might hold and decide the case on the evidence, and [if] the juror's protestation

of impartiality [should be] believed," we will say that a juror is not biased. *Id.* A juror is considered to be biased if she cannot "conscientiously apply the law and find the facts." *Wainwright v. Witt*, 469 U.S. 412, 423 (1985).

Finally, it is clearly established that "[a]n attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (citing *Strickland*, 466 U.S. at 688). It is also clear that there are "'basic rights that the attorney cannot waive without the fully informed . . . consent of the client.'" *New York v. Hill*, 528 U.S. 110, 114–15 (2000) (quoting *Taylor v. Illinois*, 484 U.S. 400, 417–18 (1988)). One such basic right is the right to an impartial jury as guaranteed by the Sixth Amendment. *See United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000). If a biased juror is seated because of error, rather than strategy, a new trial is warranted and a reviewing court need not weigh *Strickland*'s prejudice prong. *See*, *e.g.*, *id.* at 316–17 (citing *Parker v. Gladden*, 385 U.S. 363, 366 (1966) (a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors")). *See also Neder*, 527 U.S. at 8.

Therefore, I believe that Harris has met his threshold burden of showing that the law he seeks to apply was clearly established by the Supreme Court at the time of his conviction.

**B.**

I recognize the distinct possibility that Harris's counsel refrained from striking Barber as a juror as part of a calculated strategy. However, based on the record before us, I do not believe that any court, including the state appellate court, is able to determine whether Harris's attorney consciously employed this strategy, nor whether Harris approved of it. The record only indicates that

18

Harris and his attorney conversed privately during the course of *voir dire*. If, in fact, Barber was left on the jury due to the ineffective assistance of Harris's counsel rather than for permissible strategic reasons, I believe that her bias is evident in that she never swore that she could put aside her preference for police testimony and decide the case on the evidence. *See Patton*, 467 U.S. at 1036.

The state appellate court found, as did the district court, that Harris's counsel consulted with Harris several times during *voir dire*. However, the state appellate court did not determine whether Harris, in those conversations, was made aware of any trial strategy related to Barber or whether he consented to keeping Barber on the jury panel; the appellate court merely assumed that Harris and his counsel were conferring about which jurors to excuse. In determining that Harris was not prejudiced by the presence of a biased juror, I believe that the state appellate court made an unreasonable application of clearly established constitutional law. *See Edwards*, 520 U.S. at 469 ("A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him."). Further, even assuming that the state appellate court correctly appreciated *Strickland*'s prejudice prong in the context of juror bias, it is clear to me from the record that the only evidence linking Harris to the firearm used in the shooting was the testimony of the police officers; therefore, the state appellate court made an unreasonable determination of the facts in determining that police testimony was unimportant. *See* 28 U.S.C. § 2254(d).

## C.

I would find that the district court erred in its determination that the record was sufficient in two regards: first, the district court incorrectly concluded that *Strickland*'s prejudice prong must be analyzed when a possibly biased juror is present; and, second, the record does not indicate whether

19

Harris's trial counsel failed to remove Barber because of a permissible strategic reason with the informed consent of his client, or because he was constitutionally ineffective.

Because Harris can show that: if he is correct he should be released from custody, relevant facts surrounding the nature of his interaction with his counsel are in dispute, and the state court did not conduct an evidentiary hearing, *see Bowling,* 344 F.3d at 512, I believe that he is entitled to an evidentiary hearing. I would find that the district court, therefore, abused its discretion in failing to hold an evidentiary hearing to determine the facts necessary to resolve Harris's habeas petition.

## IV.

For the foregoing reasons, I would remand this case to the district court for an evidentiary hearing.