NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0136n.06

Case No. 15-1446

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 11, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DOREEN M. HENDRICKSON, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

Before: SILER, COOK, and KETHLEDGE, Circuit Judges.

**SILER**, Circuit Judge. Following a guilty verdict and the imposition of eighteen months of confinement and one year of supervised release, Doreen Hendrickson ("Hendrickson") appeals her conviction for criminal contempt under 18 U.S.C. § 401(3) and the terms of her sentence. For the reasons stated below, we **AFFIRM**.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2006, the United States brought a civil suit against Hendrickson and her husband, Peter Hendrickson, to collect tax refunds distributed in error as a result of false statements the Hendricksons made in their 2002 and 2003 federal tax returns and to enjoin the Hendricksons from filing further false materials with the Internal Revenue Service ("IRS"). In 2007, the district court granted the Government's summary judgment motion and entered an order that "prohibited [the Hendricksons] from filing any tax return, amended return, form . . . or other writing or paper with the IRS that is based on the false and frivolous claims set forth in *Cracking*

*the Code*"—a book authored by Hendrickson's husband—"that only federal, state or local government workers are liable for the payment of federal income tax or subject to the withholding of federal income, social security and Medicare taxes from their wages under the internal revenue laws."  The court's order also required the Hendricksons to file, within 30 days, "amended U.S. Individual Income Tax Returns for the taxable years ending on December 31, 2002[,] and December 31, 2003," including as gross income "the amounts that . . . Peter Hendrickson received from his former employer, Personnel Management, Inc., during 2002 and 2003, as well [as] the amounts that . . . Doreen Hendrickson received from Una E. Dworkin during 2002 and 2003."

In 2009, Hendrickson filed a return for the 2008 tax year stating that she did not earn any income, that five dollars had been withheld from her under a Form W-2, and that she was therefore entitled to a five dollar refund.  Records from Monarch Consulting indicated that the company paid Hendrickson $59.20 during 2008, but she attached to her return a Form 4852 claiming that she received no wages, tips, or other compensation from the company.

In 2010, the Government moved the district court to hold the Hendricksons in contempt for failing to file their amended 2002 and 2003 returns.  After a hearing, the court held the Hendricksons in contempt and imposed a $100 per day conditional fine on each of them until they filed the amended returns.  The Hendricksons subsequently filed returns for the tax years at issue, but the forms included the words "UNDER DURESS" written over their signatures.  The court again ordered the Hendricksons to comply, clarifying that it now "ORDER[ED] Defendants to file valid tax returns, in usable form, that in no way undermine the verity of the returns, by January 7, 2011."

In January 2011, Hendrickson filed individual tax returns for 2002 and 2003. These forms referenced an affidavit Hendrickson filed in the district court stating that she believed the original returns to be "true, correct and complete," that the amended returns "ha[d] no verity," and that she submitted the amended returns "under extreme protest." She also stated that she "disclaim[ed] these coerced amended returns because they [were] wholly false and fraudulent." The IRS rejected the amended returns because of the contents of Hendrickson's affidavit and because she changed her filing status from "married filing jointly" to "married filing separately" after the returns' due dates.

Hendrickson was then indicted on one count of felony criminal contempt in violation of 18 U.S.C. § 401(3). The indictment contained two specifications: that Hendrickson violated the order in the civil case by (1) filing a 2008 tax return that "falsely reported that she earned zero wages" that year and (2) failing to file amended returns for 2002 and 2003. The district court granted Hendrickson's motion to represent herself with the assistance of standby counsel. After pretrial proceedings and a mistrial due to the jury's failure to reach a unanimous verdict, a second trial was held, and the jury found Hendrickson guilty of criminal contempt.

Hendrickson obtained counsel for the sentencing phase of the proceedings. At the hearing, the district court sentenced her to eighteen months' imprisonment and one year of supervised release.

## DISCUSSION

### I.    Constitutionality of the Underlying Order

Hendrickson argues that the court order she was found to have contemptuously disobeyed violated her First Amendment rights, and her conviction should therefore be vacated. Alternatively, she claims that because the lawfulness of the underlying order is an element of the

crime of contempt, the district court erred by instructing the jury that the unlawfulness or unconstitutionality of the order was not a defense to the contempt charge. Both of these arguments fail.

### A. Standard of Review

In most instances, whether a district court's order granting injunctive relief violates a litigant's First Amendment rights presents a question of law that we review de novo. *See O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015) (citing *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 453 (6th Cir. 2014)); *Gas Nat. Inc. v. Osborne*, 624 F. App'x 944, 948 (6th Cir. 2015) (citing *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015)). If a party preserves an objection to a jury instruction by raising it before the jury retires to deliberate, we review the instructions "to see 'whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury.'" *Fencorp, Co. v. Ohio Ky. Oil Corp.*, 675 F.3d 933, 943 (6th Cir. 2012) (quoting *Fisher v. Ford Motor Co.*, 224 F.3d 570, 575–76 (6th Cir. 2000)); *see also United States v. Dedman*, 527 F.3d 577, 600 (6th Cir. 2008). The accuracy of jury instructions is a question of law, which we review de novo, while "the refusal to give a specifically requested instruction is reviewed for abuse of discretion." *Fencorp*, 675 F.3d at 943 (quoting *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 881 (6th Cir. 2007)).

### B. Analysis

As a threshold matter, the collateral bar rule prevents Hendrickson from challenging the constitutionality of the underlying order in the course of her criminal contempt proceeding. When a district court has personal and subject matter jurisdiction over a case, an order issued by the court "must be obeyed by the parties until it is reversed by orderly and proper proceedings."

*United States v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947). Violating such an order may be punishable by criminal contempt. *Id.* at 294 (citing *Worden v. Searls*, 121 U.S. 14 (1887)); *see also Walker v. City of Birmingham*, 388 U.S. 307, 314 (1967) (noting that, under federal and state law, parties must obey injunctions issued by a court of competent jurisdiction, "however erroneous the action of the court may be," and "until [the issuing court's] decision is reversed for error by orderly review, . . . disobedience . . . is contempt of [the court's] lawful authority, to be punished" (quoting *Howat v. Kansas*, 258 U.S. 181, 189–90 (1922))). Accordingly, we have found that a defendant in a criminal contempt proceeding may not contest the validity of the underlying court order, except on the grounds that the issuing court lacked jurisdiction or its order was "transparently invalid or had only a frivolous pretense to validity." *Dever v. Kelly*, 348 F. App'x 107, 112 (6th Cir. 2009) (quoting *Walker*, 388 U.S. at 315); *see also Polo Fashions, Inc. v. Stock Buyers Int'l, Inc.*, 760 F.2d 698, 700 (6th Cir. 1985). Other courts have also recognized exceptions to the collateral bar rule when no "adequate and effective" opportunity for appellate review exists or the underlying order "require[s] an irretrievable surrender of constitutional guarantees"— though we have never explicitly adopted or rejected these principles. *United States v. Dickinson*, 465 F.2d 496, 511 (5th Cir. 1972); *see also United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007).

This case, however, does not fall under any exception to the collateral bar rule. Hendrickson does not claim on appeal that the district court lacked jurisdiction to enter the underlying order. Also, she has not demonstrated that the order was transparently invalid or only had a frivolous pretense to validity. While she claims that the order violated her First Amendment rights, this merely "amounts to an argument that the . . . injunction was erroneously issued which . . . would not have excused compliance." *Dever*, 348 F. App'x at 112.

Further, nothing indicates that Hendrickson did not have an adequate and effective opportunity for review. After the district court entered the underlying order, Hendrickson pursued an appeal to this court, and when she did not prevail, she filed an unsuccessful petition for a writ of certiorari in the Supreme Court.

Finally, although Hendrickson maintains that the order implicates her First Amendment rights, it does not present the type of scenario that might rise to the level of an irretrievable surrender of a constitutional guarantee. The foundational case for this exception, *Maness v. Meyers*, 419 U.S. 449, 458–61 (1975), described instances when a trial court orders a witness to give testimony under circumstances that, in the witness's estimation, violate her Fifth Amendment right against self-incrimination. Because an appellate court would not be able to "unring the bell" and completely cure the error, the Court held that the witness may refuse to comply with the trial court's order and seek appellate review. *Id.* at 460. The witness may nevertheless be subject to "an adjudication of contempt if h[er] claims are rejected on appeal." *Id.* (quoting *United States v. Ryan*, 402 U.S. 530, 532–33 (1971)). Thus, regardless of whether Hendrickson's First Amendment arguments sufficiently resemble *Maness*'s Fifth Amendment concerns, the fact that she appealed the order and continued to disobey it after her arguments were unsuccessful is enough to distinguish the present case from *Maness*.

Hendrickson candidly "recognizes the authority relied on by the Government" relating to the collateral bar rule, but she nonetheless asks us to "either revisit this issue or recognize an exception to this authority in her case . . . given the nature of the constitutional violation in question." Of course, we lack authority to "revisit" an issue that has been decided by the Supreme Court. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997). Assuming *arguendo* that the order violated Hendrickson's First Amendment rights, the mere fact that an order

"unquestionably raise[s] substantial constitutional issues"—even First Amendment issues—is insufficient, standing alone, to justify departure from the collateral bar rule. *See Walker*, 388 U.S. at 315–18.[1] Even if we had the authority to do so, nothing in the facts of this case warrants crafting a new exception to the collateral bar rule out of whole cloth.

Under these circumstances, the collateral bar rule applies, and the constitutionality of the underlying order is not at issue in this case. "There is no right of revolution in a United States District Court." *United States v. Moncier*, 571 F.3d 593, 599 (6th Cir. 2009). "Every precaution should be taken that orders issue . . . only after legal grounds are shown and only when it appears that obedience is within the power of the party being coerced by the order." *Maggio v. Zeitz*, 333 U.S. 56, 69 (1948). When an order has become final, however, "disobedience cannot be justified by re-trying the issues as to whether the order should have issued in the first place." *Id.* (citing *United Mine Workers*, 330 U.S. at 259; *Oriel v. Russell*, 278 U.S. 358 (1929)).

Likewise, the district court did not commit error by instructing the jury that "[i]t is not a defense to the crime of Contempt that the Court Order that the Defendant is accused of violating was unlawful or unconstitutional." As discussed above, with certain exceptions not applicable here, "the validity of the injunction is not an issue in a criminal contempt prosecution." *Polo Fashions*, 760 F.2d at 700 (citing *Walker*, 388 U.S. at 315–20; *United Mine Workers*, 330 U.S. at 293–94). In the context of this case, therefore, the district court's instruction on this matter "fairly and adequately submit[ted] the issues and applicable law to the jury." *Fencorp*, 675 F.3d at 943 (quoting *Fisher*, 224 F.3d at 575–76). Accordingly, Hendrickson's contrary instruction that would have submitted the issue of the underlying order's lawfulness to the jury was not a

---

[1] The court order at issue in *Walker*, which enjoined civil-rights protesters from "participating in or encouraging mass street parades or mass processions without a permit" presented significantly more consequential First Amendment issues than the underlying order in the present matter, and the Supreme Court nevertheless found that the collateral bar rule applied. *Walker*, 388 U.S. at 309, 316, 320–21.

"correct statement[] of the law"—a necessary condition for relief on appeal for a refusal to give requested instructions. *United States v. Callahan*, 801 F.3d 606, 624 (6th Cir. 2015) (quoting *United States v. Hargrove*, 416 F.3d 486, 489 (6th Cir. 2005)). This alone is enough to reject Hendrickson's arguments that the district court improperly instructed the jury and that it should have given her instruction on lawfulness instead.

Nonetheless, Hendrickson maintains that the "lawfulness" of the underlying order is an element of criminal contempt under 18 U.S.C. § 401(3), which provides that a court may "punish by fine or imprisonment, or both, . . . [d]isobedience or resistance to its lawful . . . order." Hendrickson argues that, because the statute "only criminalizes contemptuous disobedience of *lawful* orders," the court's instruction "relieved the [G]overnment of its burden of having to prove an element set forth in the charging statute" and effectively directed a verdict on lawfulness. While this argument has some intuitive appeal, it lacks merit. Simply put, Hendrickson's position is at odds with the prevailing interpretation of § 401(3) and the longstanding collateral bar rule. This court has stated that the elements for criminal contempt under § 401(3) are that the defendant (1) had notice of a reasonably specific court order, (2) disobeyed it, and (3) acted with intent or willfulness in doing so. *United States v. Bibbins*, 3 F. App'x 251, 253 (6th Cir. 2001) (per curiam) (citing *United States v. Allen,* 73 F.3d 64, 67–68 (6th Cir. 1995); *United States v. Delahanty*, 488 F.2d 396, 398 (6th Cir. 1973)). And, as discussed above, "the validity of the injunction is not an issue in a criminal contempt prosecution" under the collateral bar rule, except in limited circumstances not implicated in this case. *Polo Fashions*, 760 F.2d at 700 (citing *Walker*, 388 U.S. at 315–20; *United Mine Workers*, 330 U.S. at 293–94); *see also Dolman v. United States*, 439 U.S. 1395, 1395–96 (Rehnquist, Circuit Justice 1978) ("[A] conviction for criminal contempt may be valid quite apart from the

validity of the underlying injunction which was violated, and that the invalidity of an injunction may not ordinarily be raised as a defense in contempt proceedings for its violation." (citing *Walker*, 388 U.S. at 315–20; *United Mine Workers*, 330 U.S. at 293–94)); *United Mine Workers*, 330 U.S. at 294 ("Violations of an order are punishable as criminal contempt even though the order is set aside on appeal . . . .").[2]

Hendrickson also contends that the district court's instruction on lawfulness "gutted" her ability to present a good-faith defense and directed a verdict on willfulness. This argument lacks merit because it misconstrues the good-faith defense and the willfulness requirement in the context of a criminal contempt proceeding. For purposes of criminal contempt, "willfulness" means "a deliberate or intended violation, as distinguished from an accidental, inadvertent or negligent violation" of a court order. *Vaughn v. City of Flint*, 752 F.2d 1160, 1169 (6th Cir. 1985) (quoting *TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1272 (6th Cir. 1983)). Thus, a defendant may not establish a lack of willfulness by stating that she believed the underlying order was not properly issued; "[p]ersons who make private determinations of the law and refuse to obey an order generally risk criminal contempt . . . ." *Maness v. Meyers*, 419 U.S. at 458. To hold otherwise would substantially undermine the collateral bar rule. Likewise, the good-faith defense to criminal contempt applies only where the defendant has made "a good faith

---

[2] *United States v. Koblitz*, 803 F.2d 1523, 1527 (11th Cir. 1986), which Hendrickson relies on, is distinguishable because it deals with a civil contempt order rather than a criminal contempt conviction. When the underlying order in a civil contempt proceeding is invalidated, the contempt adjudication falls along with it. *See United Mine Workers*, 330 U.S. at 295. *In re Smothers*, 322 F.3d 438, 439–40 (6th Cir. 2003), and *United States v. Turner*, 812 F.2d 1552, 1553 (11th Cir. 1987), are distinguishable because they concern instances where no opportunity existed for appellate review of the predicate order before a criminal contempt sanction was imposed. A line of precedent separate from *United Mine Workers* and *Walker* provides that the validity of the underlying order may be reviewed on appeal of a contempt conviction if that appeal presented the first opportunity to make such a challenge. *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 726 F.2d 1150, 1157–58 (7th Cir. 1984) (en banc) (Posner, J.), *rev'd on other grounds*, 470 U.S. 373 (1985); *see also Ryan*, 402 U.S. at 532 n.4; *Maness*, 419 U.S. at 460. *Smothers* and *Turner* fall within this line, while the present case does not.

Additionally, the cases Hendrickson relies on that concern charges of resisting arrest and assault on a police officer are fundamentally inapposite because the collateral bar rule applies to court orders, not the actions or commands of police officers.

effort *to comply* with [the] court order." *United States v. Simmons*, 215 F.3d 737, 741 (7th Cir. 2000) (emphasis added); *see also United States v. Maccado*, 225 F.3d 766, 772 (D.C. Cir. 2000); *United States v. Remini*, 967 F.2d 754, 757 (2d Cir. 1992); *United States v. Baker*, 641 F.2d 1311, 1317 (9th Cir. 1981).[3] While "act[ing] under an honest, although incorrect, misunderstanding of [a] court order" is a defense to criminal contempt, *United States v. Quality Formulation Labs., Inc.*, 512 F. App'x 237, 240 (3d Cir. 2013) (citing *United States v. Gross*, 961 F.2d 1097, 1103 (3d Cir. 1992)), the fact that a "person believes in good faith that the court order is unlawful" is not, *United States v. Underwood*, 880 F.2d 612, 618–19 (1st Cir. 1989). The district court's instruction on lawfulness was not, therefore, erroneous.

## II.     Specific Unanimity Instruction

Hendrickson also claims that the district court erred by incorrectly instructing the jury that specific unanimity—that is, a unanimous decision among jury members as to *how* she violated the order—was not required in this case. A specific unanimity instruction was not warranted in this case. Even if it were, however, any error the district court may have made was harmless.

### A.      *Standard of Review*

Because Hendrickson requested the inclusion of a specific unanimity instruction and objected to the instruction that specific unanimity was not required, we review the district court's refusal to give a specific unanimity instruction for abuse of discretion. *United States v. Wilson*, 579 F. App'x 338, 347 (6th Cir. 2014) (citing *United States v. Reichert*, 747 F.3d 445, 451 (6th Cir. 2014)), *cert. denied*, 135 S. Ct. 421 (2014), *and cert. denied sub nom. Williamson v. United States*, 135 S. Ct. 1470 (2015). But to the extent that Hendrickson claims that the given

---

[3] To be clear, as the district court correctly instructed the jury, good faith is not a separate defense to criminal contempt, but rather a specific avenue for negating willfulness. *See Simmons*, 215 F.3d at 741; *Baker*, 641 F.2d at 1317.

instructions misstated the law, de novo review applies. *Reichert*, 747 F.3d at 451. If the district court failed to a give a required specific unanimity instruction, we must still engage in harmless-error review, as such a failure does not constitute structural error. *United States v. Tragas*, 727 F.3d 610, 617 (6th Cir. 2013) (citing *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000)).

### B.    Analysis

Specific unanimity instructions are a method of curing "duplicitous" charges, which "set[] forth separate and distinct crimes in one count" and create a risk that a defendant's right to a unanimous verdict would be undermined "if individual jurors find [her] guilty of different crimes." *United States v. Eaton*, 784 F.3d 298, 308 (6th Cir. 2015) (quoting *United States v. Kakos*, 483 F.3d 441, 443 (6th Cir. 2007)). Nonetheless, "a charge that permits more than one factual basis for conviction 'does not automatically require a unanimity instruction.'" *Id.* (quoting *United States v. Algee*, 599 F.3d 506, 514 (6th Cir. 2010)).

While a federal jury cannot convict in a criminal case unless it unanimously concludes that the Government has proven each element of the charged offense, the "jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element." *Richardson v. United States*, 526 U.S. 813, 817 (1999) (citing *Schad v. Arizona*, 501 U.S. 624, 631–32 (1991) (plurality opinion)). Thus, the "pivotal distinction" is that the jury must unanimously decide that all facts that constitute "elements" of a crime occurred, but it does not necessarily need to be unanimous when considering the "brute facts" or "means" that make out an element. *Eaton*, 784 F.3d at 308 (citing *Richardson*, 526 U.S. at 817–19; *United States v. DeJohn*, 368 F.3d 533, 540–41 (6th Cir. 2004)). The existence of "multiple factual bases" in a charge warrants a special unanimity instruction where

> (1) the nature of the evidence is exceptionally complex or the alternative specifications are contradictory or only marginally related to each other; or (2) there is a variance between indictment and proof at trial; or (3) there is tangible indication of jury confusion, as when the jury has asked questions or the court has given regular or supplementary instructions that create a significant risk of nonunanimity.

*United States v. Miller*, 734 F.3d 530, 538–39 (6th Cir. 2013) (quoting *United States v. Damra*, 621 F.3d 474, 504–05 (6th Cir. 2010)).

Hendrickson contends that the jury should have been instructed that, to convict, they were required to unanimously decide that she filed a false tax return for 2008 based on the theories in *Cracking the Code*, that she failed to file her 2002 and 2003 tax returns, or both. She limits her arguments to a claim that the alternative specifications in the indictment were, at most, merely "marginally related." To support this proposition, Hendrickson reasons that the underlying order contained two separate and distinct injunctions—a prohibition against filing further returns based on *Cracking the Code* and a requirement to affirmatively file returns for 2002 and 2003—and that the events described in the indictment relating to these two injunctions are "different in kind" and "temporal[ly] dispar[ate]." The Government counters that the order included "a single injunction that contained two directives: (1) file amended tax returns for . . . 2002 and 2003; and (2) refrain from filing tax returns that contained false information similar to that in the original 2002 and 2003 returns," and "the indictment charged [Hendrickson] with violating the single injunction in two ways." According to this argument, these two directives had the single aim of compelling compliance with the tax code, and the methods that the indictment charged Hendrickson with violating the order were related.

On one hand, the essence of Hendrickson's argument—that the conduct she was charged with represents two factually and temporally distinct events—carries some force. Juries' ability to disagree about means is limited where such disagreement "risks serious unfairness and lacks

support in history or tradition." *Richardson*, 526 U.S. at 820 (citing *Schad*, 501 U.S. at 632–33 (plurality opinion); *Schad*, 501 U.S. at 651 (Scalia, J., concurring)). For example, it would be impermissible for "an indictment [to] charg[e] that the defendant assaulted either X on Tuesday or Y on Wednesday." *Schad*, 501 U.S. at 651 (Scalia, J., concurring); *see also Richardson*, 526 U.S. at 820 (citing Justice Scalia's *Schad* concurrence for this proposition). Viewed in the way Hendrickson proposes, this case may resemble Justice Scalia's hypothetical. The countervailing position is, however, much stronger because no risk of serious unfairness exists in this case. The indictment contained a single charge that Hendrickson contemptuously disobeyed a court order. Regardless of whether the underlying order is best conceptualized as two injunctions or one injunction containing two directives, the order was handed down in its entirety all at once. Hendrickson's actions in contravention of the order also had a single unifying theme. Her filings were predicated on the faulty legal theories the order contemplated. Thus, more than a marginal relation exists between the alternative specifications, and they are related enough to avoid a risk of serious unfairness, especially in light of the limited factual complexity of the case.[4]

Moreover, Hendrickson is not entitled to relief because any error the district court committed in charging the jury was harmless. Assuming without deciding that the most stringent standard for harmless-error review applies,[5] Hendrickson is not entitled to relief if "it appears

---

[4] Hendrickson's discussion of *Miller*, 734 F.3d 530, and *United States v. Schmeltz*, 667 F.3d 685, 686 (6th Cir. 2011), is unavailing. In both *Miller* and *Schmeltz*, we found that a specific unanimity instruction was not required. *See Miller*, 734 F.3d at 539; *Schmeltz*, 667 F.3d at 688. Although Hendrickson attempts to work backwards from these holdings, her reasoning does not establish that the alternative specifications in her own indictment were, in fact, only marginally related.

[5] In the context of an error of constitutional magnitude, harmless-error review requires "pro[of] *beyond a reasonable doubt* that the error did not affect the verdict." *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015) (citing *United States v. Miner*, 774 F.3d 336, 342, 350 (6th Cir. 2014)), *cert. denied sub nom. Ferguson v. United States*, 136 S. Ct. 700 (2015). If non-constitutional errors are involved, all that is required is "*a preponderance of the evidence* that the error did not materially affect the verdict." *Id.* (citing *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946)). It is unclear whether the failure to give a necessary specific unanimity

'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder v. United States*, 527 U.S. 1, 15 (1999) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)); *see also United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015), *cert. denied sub nom. Ferguson v. United States*, 136 S. Ct. 700 (2015). Hendrickson did not argue that she, in fact, filed adequate returns for 2002 and 2003 or that she did not file the 2008 return containing false information. Instead, she relied primarily on a good faith defense predicated on her belief that the underlying order violated her First Amendment rights. However, this defense was inadequate as a matter of law, so no reasonable juror could have voted to acquit her on this basis. Indeed, the Government argued in its brief that any error in the jury instructions was harmless because Hendrickson "did not even contest the underlying acts that formed the basis for the contempt charge," and Hendrickson did not dispute this assertion in her reply brief. Moreover, as the district court noted in ruling on Hendrickson's post-trial motions, the great weight of evidence presented at trial supported a guilty verdict under either specification. Therefore, regardless of whether the district court erred in its instructions, the harmless-error doctrine applies, and Hendrickson is not entitled to relief.[6]

### III. Sixth Amendment Self-Representation

Hendrickson also challenges her conviction on Sixth Amendment grounds, claiming that her right of self-representation was violated when, during her testimony, her standby counsel failed to ask her certain questions that she instructed him to ask.

---

instruction is an error of constitutional magnitude, but the Supreme Court has indicated that the issue at least implicates constitutional concerns. *See Richardson*, 526 U.S. at 819. Resolving this issue is unnecessary because any error was harmless even under the more demanding standard.

[6] To counter the application of the harmless-error doctrine, Hendrickson contends that the evidence at the second trial "was far from overwhelming" because her first trial resulted in a hung jury, but this argument misses the point. The proper inquiry is whether "*the error complained of . . .* contribute[d] to the verdict obtained." *Neder*, 527 U.S. at 15 (emphasis added). The district court's unanimity instructions at both trials were substantially similar. Moreover, the record indicates that the mistrial resulted from a single juror's refusal to convict without having seen evidence relating to extraneous issues. Under these particular circumstances, a previous hung jury in the same matter does not tend to show that the district court's unanimity instruction had any effect on the verdict.

A.      *Standard of Review*

Because Hendrickson did not object to her standby counsel's failure to ask her requested questions until after trial,[7] we review her Sixth Amendment claim for plain error.  *United States v. Thomas*, 74 F.3d 701, 712 (6th Cir. 1996); *see also United States v. Marcus*, 560 U.S. 258, 262 (2010) (finding that issues "not raised at trial" are reviewed for plain error); *United States v. Viscome*, 144 F.3d 1365, 1370 (11th Cir. 1998) (reviewing a constitutional argument raised for the first time prior to sentencing for plain error).  Under this standard, we ordinarily may only reverse if the appellant "demonstrates that (1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  *Marcus*, 560 U.S. at 262 (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).  However, a violation of the right to represent oneself is a "structural" error, and such an error "may be cognizable despite the lack of a third-prong showing that it actually prejudiced the appellant or affected the outcome of the proceedings."  *United States v. Lawrence*, 735 F.3d 385, 401 (6th Cir. 2013) (citing *Marcus*, 560 U.S. at 263; *United States v. Barnett*, 398 F.3d 516, 526 (6th Cir. 2005)), *cert. denied*, 135 S. Ct. 753 (2014).  Structural claims are also not subject to harmless-error analysis.  *Id.*; *see also McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984).

---

[7] In a motion for release pending appeal, Hendrickson claimed that, after standby counsel failed to ask the requested questions, she "quietly turned to the Court and asked to speak with standby counsel, but the Court refused this request."  The district court found that Hendrickson did not make this request.  The court also found that she had an opportunity to raise the issue at a sidebar immediately following the conclusion of her testimony, but she did not.  Hendrickson admits that her alleged statement to the court does not appear in the record.  But even assuming that it did take place, Hendrickson's request was insufficient to avoid plain error review in light of the fact that she had a clear opportunity to raise the issue at the sidebar but did not.  "To avoid plain-error review, '[a] party must object with that reasonable degree of specificity which would have adequately apprised the trial court of the true basis for h[er] objection.'"  *United States v. Corp*, 668 F.3d 379, 387–88 (6th Cir. 2012) (quoting *United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004)).  Hendrickson did not satisfy this standard.

B.      Analysis

The Sixth Amendment provides that

[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed
of the nature and cause of the accusation; to be confronted with the witnesses
against him; to have compulsory process for obtaining witnesses in his favor, and
to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.  In *Faretta v. California*, 422 U.S. 806, 819–20 (1975), the Supreme

Court found that the structure of the Sixth Amendment "necessarily implie[s]" that criminal

defendants enjoy "the right to self-representation."    Under certain circumstances, the

participation of standby counsel raises Sixth Amendment concerns; "the objectives underlying

the right to proceed *pro se* may be undermined by unsolicited and excessively intrusive

participation by standby counsel." *McKaskle*, 465 U.S. at 177.  Pro se defendants are "entitled to

preserve actual control over the case [they] choose[] to present to the jury"; therefore, "[i]f

standby counsel's participation over the defendant's objection effectively allows counsel to make

or substantially interfere with any significant tactical decisions, or to control the questioning of

witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is

eroded." *Id.* at 178.[8]  Nonetheless, "[a] defendant's invitation to counsel to participate in the trial

obliterates any claim that the participation in question deprived the defendant of control over his

own defense." *Id.* at 182.  Accordingly, "a *pro se* defendant's solicitation of or acquiescence in

certain types of participation by counsel substantially undermines later protestations that counsel

interfered unacceptably." *Id.*  Ultimately, in considering whether the right to self-representation

was violated, the court's "primary focus [is] on whether the defendant had a fair chance to

present h[er] case in h[er] own way." *Id.* at 177.

---

[8] *McKaskle* indicates that a defendant's *Faretta* rights may also be violated when "participation by standby
counsel without the defendant's consent . . . destroy[s] the jury's perception that the defendant is representing
h[er]self." *McKaskle*, 465 U.S. at 178.  Hendrickson does not claim that this principle applies in the present matter.

Hendrickson requested the district court to allow her to proceed with the assistance of standby counsel. At trial, she decided to testify in her own defense, and standby counsel informed the district court that he planned to question Hendrickson during her direct examination. Hendrickson did not object or otherwise correct him. Nor did she raise an objection to contest this procedure at the time she took the stand. Hendrickson provided standby counsel with scripted questions for her examination, but he did not ask her a series of questions relating to her beliefs regarding the legal validity of the order that was the subject of her contempt charge, including questions related to her understanding of and reliance on First Amendment precedent. Standby counsel explained that the Government had repeatedly objected to similar lines of inquiry and that he did not ask the questions because Hendrickson had already "struggle[d] to provide answers to some of the questions she had provided." "[I]n response to . . . Hendrickson expressing concern that the questions were not asked," counsel "suggested that she attempt to incorporate some of the points regarding her reliance on authorities interpreting the First Amendment into her closing argument." Nothing in the record indicates that Hendrickson raised her concerns to the district court during trial or that she attempted to retake the stand to pursue this line of questioning.

Hendrickson claims that this series of events violated her right to self-representation such that she is entitled to a new trial. She suggests that, because the right to self-representation is structural, *any* transgression that conceivably implicates her *Faretta* rights—no matter how slight—constitutes reversible error. But it is not the case that "every deprivation in a category considered to be 'structural' constitutes a violation of the Constitution or requires reversal of the conviction, no matter how brief the deprivation or how trivial the proceedings that occurred during the period of deprivation." *Ramos v. Racette*, 726 F.3d 284, 289 (2d Cir. 2013) (quoting

*Gibbons v. Savage*, 555 F.3d 112, 120 (2d Cir. 2009)), *cert. denied sub nom. Ramos v. Chappius*, 134 S. Ct. 649 (2013); *see also United States v. Arellano-Garcia*, 503 F. App'x 300, 305 (6th Cir. 2012). As discussed above, the relevant inquiry is whether Hendrickson had a fair chance to present her case in a manner of her own choosing.

Hendrickson's Sixth Amendment claim is fatally undercut by the fact that she acquiesced to standby counsel's participation. Hendrickson's failure to object to the participation of standby counsel is a "crucial respect" in which her case differs from *McKaskle*—a difference that "substantially undermines" her claim. *United States v. French*, 748 F.3d 922, 931–33 (9th Cir.) (quoting *McKaskle*, 465 U.S. at 182–83), *cert. denied*, 135 S. Ct. 384 (2014). "Once a *pro se* defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence," until the defendant "expressly and unambiguously" objects to standby counsel's actions. *McKaskle*, 465 U.S. at 183. Here, Hendrickson explicitly requested the assistance of standby counsel, so this presumption applies.

Hendrickson maintains that she did not acquiesce in standby counsel's actions, claiming that, for Sixth Amendment self-representation purposes, a defendant only acquiesces to the actions of standby counsel "when she consistently and deliberately relinquishes control over her trial." This proposed standard lacks a basis in *McKaskle*, which recognized that "acquiescence in certain types of participation" would "substantially undermine[] later protestations that counsel interfered unacceptably." *Id.* at 182. Indeed, the defendant in *McKaskle*, unlike Hendrickson, raised numerous objections to the participation of standby counsel. *See id.* at 182–83.

While Hendrickson emphasizes that she "confronted standby counsel in considerable dismay and denunciation of his actions at the first chance to do so," this is not enough to

demonstrate that she did not acquiesce. Counsel apparently suggested that she attempt to discuss the unasked questions' subject matter during her closing argument, and she did not attempt to retake the stand. Hendrickson argues that standby counsel's failure to ask the requested questions prevented her from addressing certain First Amendment precedent during her closing, but this is immaterial. She did not expressly and unambiguously raise an objection to the district court, and she chose not to seek to develop the testimony at issue on counsel's advice that she address the topic at closing. Such a "deliberate tactical decision" will not give rise to a *Faretta* claim, regardless of whether it is successful. *French*, 748 F.3d at 932.

Simply stated, Hendrickson was not denied a fair chance to present her own case in a manner of her choosing. Counsel's failure to ask certain questions of Hendrickson was not so invidious that it deprived her of the *opportunity* to develop testimony related to what she perceived as an important issue in the case. She allowed standby counsel to question her. She could have, but never did, object to counsel's conduct during trial. She could have, but never did, raise the issue at sidebar. She could have, but never did, seek to retake the stand after consulting with counsel. At bottom, she takes umbrage with the way standby counsel executed his responsibilities. But "[a] defendant does not have a constitutional right to choreograph special appearances by counsel." *McKaskle*, 465 U.S. at 183. Hendrickson's claim, therefore, fails.

If this result seems anomalous, it may be because Hendrickson couches in self-representation terms what is essentially a claim sounding in ineffective assistance of counsel. This strategy is certainly not unheard of. *See Washington v. Renico*, 455 F.3d 722, 733–34 (6th Cir. 2006). And it is certainly understandable, as a successful *Faretta* claim would allow her to avoid the required demonstration of prejudice under *Strickland v. Washington*,

466 U.S. 668 (1984). The flip side of this tactic, however, is that she must show that standby counsel's actions prevented her from having a fair chance to present her case in a manner of her choosing. She has not done so.[9] Therefore, she is not entitled to relief on this ground.

## IV. Sentencing

Apart from her arguments that her conviction should be vacated, Hendrickson also challenges her sentence as procedurally unreasonable.

### A. Standard of Review

We review the district court's sentencing determination for reasonableness under the deferential abuse-of-discretion standard. *United States v. Baker*, 559 F.3d 443, 448 (6th Cir. 2009) (citing *Gall v. United States*, 552 U.S. 38, 41 (2007); *United States v. Stephens*, 549 F.3d 459, 464 (6th Cir. 2008)). While this inquiry has both a procedural and a substantive component, *id.*, Hendrickson has only claimed procedural unreasonableness. "A sentence is procedurally unreasonable if the district court fails to calculate (or improperly calculates) the Guidelines range, treats the Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails to adequately explain the chosen sentence." *Id.* (citing *Gall*, 552 U.S. at 51); *see also United States v. Hall*, 632 F.3d 331, 335 (6th Cir. 2011).

### B. Analysis

Under USSG § 2J1.1, no specific sentencing guideline applies to criminal contempt convictions. Instead, the Guidelines refer the sentencing court to § 2X5.1, which directs the court to "apply the most analogous offense guideline." In the event that "there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control." USSG

---

[9] Because Hendrickson did not bring an ineffective assistance claim and the parties have not briefed the issue, we do not consider whether standby counsel's performance was deficient or whether Hendrickson was prejudiced by his conduct.

§ 2X5.1. The district court relied on § 2T1.1, which covers, among other things, willful failure to file a tax return. Under this provision, the applicable base offense level is keyed to the amount of "tax loss" attributable to the defendant. *See* USSG § 2T1.1(a). In calculating the relevant tax loss, the court applied § 2T1.1(c)(4), which provides that, "[i]f the offense involved improperly claiming a refund to which the claimant was not entitled, the tax loss is the amount of the claimed refund to which the claimant was not entitled." The court noted that the civil order found that the Hendricksons claimed erroneous refunds for the 2002 and 2003 tax years in a total amount of $20,380.96, an amount of loss that carried a Base Offense Level of 12. *See* USSG § 2T4.1(D). Ultimately, the sentencing court determined that Hendrickson had an Adjusted Offense Level of 12 and that she fell into Criminal History Category II, resulting in an advisory range of 12 to 18 months of imprisonment, and sentenced her to 18 months of confinement. On appeal, Hendrickson argues that the court improperly applied § 2T1.1(c)(4) instead of § 2T1.1(c)(2) to calculate the applicable tax loss and that, under § 2T1.1(c)(2), the amount of tax loss attributable to Hendrickson would have resulted in an Offense Level of 6 or 8, with an advisory range of 0 to 6 or 1 to 7 months' imprisonment, respectively.[10]

At the outset, the district court did not abuse its discretion in applying § 2T1.1(c)(4) to calculate the tax loss attributable to Hendrickson. She argues that the court "characteriz[ed the matter] . . . as a failure to file tax returns case," but relied on § 2T1.1(c)(4), "which applies in cases where 'the offense involved improperly claiming a refund to which the claimant was not entitled.'" Hendrickson maintains that the offense she was charged with did not concern the

---

[10] In her brief, Hendrickson hints at an argument that the sentencing court should not have looked to § 2T1.1 at all, instead relying only on the sentencing factors contained in 18 U.S.C. § 3553. Because she only "advert[s] to [this argument] in a perfunctory manner" without an "effort at developed argumentation," she has waived this issue on appeal. *United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). A party may not raise an issue on appeal by "mention[ing it] . . . in the most skeletal way, leaving the court to . . . put flesh on its bones." *Id.* (third alteration in original) (quoting *McPherson*, 125 F.3d at 995–96).

2002 and 2003 refunds and that the factual basis of her conviction was "wholly unrelated to the existence of the fact that she and her husband may be indebted to the [G]overnment because of an allegedly improperly received refund."

The commentary to § 2T1.1 provides that "[i]n determining the tax loss attributable to the offense, the court should use as many methods set forth in subsection (c) and this commentary as are necessary given the circumstances of the particular case." USSG § 2T1.1 cmt. app. n.1; *see also United States v. Hoskins*, 654 F.3d 1086, 1095 n.10 (10th Cir. 2011); *United States v. Kellar*, 394 F. App'x 158, 169 (5th Cir. 2010). "In determining the total tax loss attributable to the offense . . . , all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." USSG § 2T1.1 cmt. app. n.2. Accordingly, "[f]or sentencing purposes, the use of tax loss resulting from uncharged conduct is authorized." *United States v. Pierce*, 17 F.3d 146, 150 (6th Cir. 1994).[11]

With these principles in mind, Hendrickson's arguments lack merit because her actions surrounding the 2002 and 2003 refunds are related to her offense conduct. She was charged, in part, with failing to file returns for 2002 and 2003 properly reporting her and her husband's income in contempt of a court order. Prior to the order, the Hendricksons had received improper refunds for those years based on an assertion that their wages did not constitute taxable income,

---

[11] We have also held that *civil* tax liability is not attributable to a defendant under § 2T1.1. *Pierce*, 17 F.3d at 150 (citing *United States v. Daniel,* 956 F.2d 540, 544 (6th Cir. 1992)). Only *criminal* tax liability that is part of the same course of conduct may be counted. *Id.* As stated above, however, the conduct need not actually be charged for the corresponding loss to be attributable. *Id.* Loss resulting from conduct that is criminal *in nature* falls within § 2T1.1(c). *See United States v. Kennedy*, 595 F. App'x 584, 589–90 (6th Cir. 2015); *United States v. Edkins*, 421 F. App'x 511, 516 (6th Cir. 2010). And Hendrickson's conduct that led to her receipt of erroneous refunds was criminal for purposes of § 2T1.1(c) liability, though she was not indicted for it. *See United States v. Bove*, 155 F.3d 44, 48 (2d Cir. 1998) ("It is beyond cavil that [the defendant's] failure to declare certain W-2 income in his . . . tax return amounts to criminal conduct under the tax code."); *see also United States v. Hendrickson*, 460 F. App'x 516, 517–20 (6th Cir. 2012) (per curiam) (affirming conviction of Peter Hendrickson for, among other things, filing false tax documents for the 2002 and 2003 tax years).

and the order sought to remedy this. Accordingly, the refunds were not "clearly unrelated" to her failure to file the 2002 and 2003 returns, especially in light of the Guidelines' indication that a "continuing pattern of violations of the tax laws," the "use[ of] a consistent method to evade . . . income," a set of "violations [that] involve the same or a related series of transactions," and a set of "violation[s that] in each instance involves a failure to report . . . a specific source of income" each indicate that a defendant's conduct "is part of the same course of conduct or common scheme or plan." USSG § 2T1.1 cmt. app. n.2. Hendrickson's conduct fits within each of these categories; thus, the district court did not abuse its discretion in applying § 2T1.1(c)(4) to calculate the loss related to the returns.

Hendrickson's remaining arguments on this point fare no better. In her reply brief, she claims that the amount of the refund contained in the order was "illegitimate" because the IRS never assessed a tax liability in this amount against her or her husband and because the "$20,380.96 figure was offered at trial in the form of an informal 'examination report' as 'evidence' of the tax liabilities purportedly due." At the outset, Hendrickson waived these arguments by failing to raise them in her opening brief. *See Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held, . . . that arguments made to us for the first time in a reply brief are waived." (citing *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004))). Nevertheless, they lack merit. An assessment is not a prerequisite for criminal liability, *United States v. Daniel,* 956 F.2d 540, 542 (6th Cir. 1992), and the Guidelines permitted the district judge to "make a reasonable estimate [of the tax loss attributable to Hendrickson]

based on the available facts," USSG § 2T1.1 cmt. app. n.1.  The fact that the examination report

"did not constitute a formal audit or examination" did not make reliance on it unreasonable.[12]

Accordingly, the district court did not abuse its discretion in applying § 2T1.1(c)(4) to

calculate the tax loss attributable to Hendrickson.  Her sentence was therefore procedurally

reasonable, and we need not address her alternative proposed calculations under § 2T1.1(c)(2).

**AFFIRMED**.

---

[12] Moreover, the fact that Hendrickson's husband was involved in the filing of their joint 2002 and 2003 returns does not change the amount of loss attributable to Hendrickson.  *See United States v. Bishop*, 291 F.3d 1100, 1115 (9th Cir. 2002) (finding that where spouses are "co-actors," "the total tax loss . . . is attributable to each defendant").